**In re Kandi KAUFMAN, Debtor.**

**Kandi Kaufman, Plaintiff,**

**v.**

**Joe Monte, Polo Investments Fund I, Coast Capital Corporation et al., Defendants.**

**Bankruptcy No. 00–44380–J. Adversary No. 03–4028AJ.**

United States Bankruptcy Court, N.D. California.

Oct. 19, 2004.

Duane L. Tucker, Law Offices of Duane L. Tucker, San Mateo, CA, for Debtor.

Mark L. Pope, Office of the U.S. Trustee, Oakland, CA, for U.S. Trustee.

Gregory S. Lyons, Law Offices of Gregory S. Lyons, Oakland, CA, for Plaintiff.

Felix A. Seidler, Reeves, Seidler and Howell, Alameda, CA, for Defendants.

## DECISION (AMENDED)

EDWARD D. JELLEN, Bankruptcy Judge.

By this adversary proceeding, plaintiff Kandi Kaufman ("Kaufman"), the above debtor, seeks an award of damages pursuant to Bankruptcy Code § 362(h) based on defendants' acts in willful violation of the automatic stay provided by Bankruptcy Code § 362(a).[1] The court finds that defendants Polo Investments Fund I ("Polo"), Joe Monte ("Monte"), ECI Corporation dba Coast Capital Corporation ("Coast"), and Albino Auction Co. ("Albino") sold or caused to be sold Kaufman's personal property and possessions in willful violation of the automatic stay. (The court will hereafter refer to defendants Polo, Monte, Coast, and Albino as "Defendants."[2]) The court also finds that the willful misconduct of Defendants warrants the imposition of punitive damages. The court will therefore enter its judgment in favor of Kaufman as hereinafter set forth.

### A. BACKGROUND

The key dates and core facts are set forth in this section of the court's Memorandum. Additional relevant facts are set forth in the sections that follow. On July 25, 2000, Kaufman filed a voluntary petition under chapter 13 of the Bankruptcy Code. Prior to the filing of the petition, Kaufman had been the owner of a residence in Orinda, California (the "Residence"). In February 1999, Kaufman was in default under at least one loan secured by a deed of trust on the Residence. However, she received at that time a written solicitation from Coast telling her that "with sufficient equity" she could avoid foreclosure with a refinance loan "regardless of credit history, income, or employment." In response, Kaufman applied to Coast for a refinance loan.

Kaufman's loan application disclosed that Kaufman was unemployed, that she had outstanding judgments against her, that she was delinquent on her home mortgage, that she had previously filed bankruptcy, and that she was a party to a pending lawsuit. The application disclosed no assets other than the Residence.

Based on this application and her substantial equity in the Residence, Coast agreed to arrange a loan for Kaufman.

---

1. Unless otherwise noted, all further section references herein are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

2. At the conclusion of trial, Kaufman's counsel stated that Kaufman was dropping her claims against all the other defendants.

Kaufman testified that at the time of the loan, she was trying to start a new sales and marketing business, and that Coast had initially assured her that, based on her equity in the Residence, the loan would be in an amount sufficient to both refinance the current outstanding encumbrances against the Residence and provide Kaufman with cash she could use to service the new loan for a limited period while she attempted to build up her new business. According to Kaufman, Coast at the last minute reduced the amount it was willing to loan to eliminate the cash component. Facing foreclosure, Kaufman agreed to borrow funds in the reduced amount.

The loan was arranged by Coast and made by Polo, a partnership organized by Coast.

The loan was secured by a deed of trust on the Residence. The loan was not secured by Kaufman's furniture, clothing, or any other personal property inside the Residence.

Not surprisingly, the loan immediately went into default. On January 10, 1999, Coast, as foreclosure trustee and Polo's loan agent, completed a foreclosure sale of the Residence on behalf of Polo. Polo's credit bid was the successful bid at the sale.

Following the foreclosure sale, Coast succeeded in obtaining an unlawful detainer judgment against Kaufman with the assistance of attorney Felix Seidler ("Seidler"), counsel herein for the Defendants. On July 7, 2000, Coast physically evicted Kaufman from the Residence with the assistance of the Contra Costa Sheriff. Concurrently, Coast designated its loan officer, defendant Monte, to deal with the personal property on the premises. (Monte subsequently acquired the Residence in his personal capacity, and as of the time of trial, was the owner. *See infra.*)

Sometime around July 18, 2000, Coast, through Monte, removed most[3] of Kaufman's personal possessions from the Residence and caused them to be taken to Albino's auction premises. On July 25, Kaufman filed her chapter 13 petition. Thereafter, on August 7 and 8, Albino conducted a public lien sale of Kaufman's personal possessions, according to Albino, to satisfy storage charges. The items sold included substantially all of Kaufman's furniture, clothing, and other personal and household items. Numerous boxes of binders and promotional materials that Kaufman had developed for her proposed new business at substantial expense did not sell at the lien sale, and Albino dumped them in the trash.

The lien sale produced proceeds that exceeded the amount of any storage charges to which Defendants may have been entitled, *see infra.*, p. 871, yet Defendants kept the excess proceeds, to which Kaufman was entitled.

After the lien sale, Kaufman commenced the present adversary proceeding.[4] As originally filed, it included numerous claims under nonbankruptcy law that were "noncore" under 28 U.S.C. § 157(b)(2) and potentially subject to a jury trial. The court elected to dismiss these claims without prejudice, retaining only Kaufman's claims under Bankruptcy Code § 362(h). As so limited, the trial proceeded.

## B. DEFENDANTS VIOLATED THE AUTOMATIC STAY

Section 362(a) provides in relevant part:

---

**3.** Monte did keep several items for himself; *see infra.*

**4.** Kaufman's chapter 13 case was dismissed after Kaufman filed her complaint and before the trial, but this court retained jurisdiction to hear this adversary proceeding. *See* Order Regarding Dismissal of Debtor's Case, filed December 2, 2002.

(a) Except as provided in subsection (b) of this section, a petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—

...

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title ....

Here, it is clear that Defendants violated the automatic stay.[5] As of the date of Kaufman's bankruptcy petition, at the dates of the lien sale, and at all times in between, Kaufman was the owner of the items Polo and Coast caused to be sold at the lien sale. Monte, acting on behalf of Polo and Coast, exercised dominion and control over Kaufman's personal property by withholding possession from her, arranging for Albino to sell the property at the lien sale, and by the conduct of the lien sale. Section 362(a)(3), (4), and (6). The sale was an act to enforce an alleged storage lien and to recover a claim against Kaufman that first arose, if at all, on approximately July 18, 2000 (the date Polo and Coast caused the contents of the Residence to be taken to Albino), prior to the filing of Kaufman's chapter 13 petition. Section 362(a)(6).

Defendants argue that the lien sale did not violate the automatic stay: (1) because Albino was the holder of a prepetition storage lien on Kaufman's property and thus had no obligation to restore Kaufman to possession, and (2) because Kaufman did not timely comply with certain provisions of California law that set forth time limits by which an evicted tenant must act to regain possession of personal property. *See* California Code of Civil Procedure § 1174(h).[6]

■ Both arguments are frivolous. As to the first, it is true, as Defendants point out, that a lienholder with a valid prepetition possessory lien does not violate the stay under § 362(a)(3) merely by refusing to return possession of encumbered property to the debtor. *See* §§ 362(b)(3) and 546(b); *In re Boggan,* 251 B.R. 95 (9th Cir. BAP 2000).

■ Here, however, even if Albino had a valid prepetition possessory lien on

---

**5.** Technically, at the time of the lien sales, all the personal property inside the Residence was "property of the estate" rather than "property of the debtor," thus implicating subsections (3), (4), and (6) of § 362(a). Kaufman's property became property of the estate upon the filing of her chapter 13 petition. Section 541(a). As of the time of the lien sale on August 7 and 8, 2000, Kaufman's claims of exemption as to the property in the Residence had not yet been finally allowed, and thus, had not yet re-vested in Kaufman as "property of the debtor" pursuant to § 522(b). See Fed.R.Bankr.P. 4003(b). Nor, as of the time of the sale, had Kaufman's chapter 13 plan been confirmed, which confirmation would have also re-vested the personal property in Kaufman personally. Section 1327(b). Here, the distinction between property of the estate and property of the debtor makes little difference; in either case Defendants clearly violated several subsections of § 362(a). *See, e.g., In re Sedgwick,* 266 B.R. 185 (Bankr.N.D.Cal.2001).

**6.** The California Civil Code is hereinafter referred to as "Civ." and the California Code of Civil Procedure is hereinafter referred to as "CCP."

Kaufman's personal property,[7] Albino's retention of possession is a far cry from, and in no way analogous to, its conduct of a lien sale at the behest of the other Defendants, the major violation that occurred here.

The distinction is not a mere technicality. In the former case, retention of possession, the debtor may have a right to regain possession from the lienholder through postbankruptcy payment of the secured obligation under a chapter 13 plan or by court order, or by obtaining a "turnover order" from the court pursuant to § 542(a).[8] *See United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). In addition, in the case of exempt property, as was involved here, a debtor also has the right under the Bankruptcy Code to redeem property from a lien pursuant to § 722.[9] And, of course, in the former case, the debtor and estate are protected from a forced sale unless the court, after notice to the debtor and a hearing, enters an order lifting or conditioning the automatic stay.

In the case of a lien sale, on the other hand, the debtor is divested of title. All of the debtor's rights to pay off the lien through a chapter 13 plan, redeem the encumbered property, maximize value or preserve equity through an orderly market sale, or to seek turnover are gone if the lien sale is valid. Indeed, Bankruptcy Code § 362(a) distinguishes between possession and control (subsection (3)) and other lien enforcement such as a sale (subsections (4),(5), and (6)).

■ Defendants' second argument is equally frivolous. California law sets forth a detailed set of procedures regarding a tenant's personal property following an eviction. *See* CCP § 1174(g), (h), and (i), Civ. § 1965(a), and Civ. § 1988. After an eviction, the landlord in possession of the property has a duty to return it to the tenant if the tenant: (a) requests in writing the personal property within 18 days after the eviction, (b) tenders payment of any reasonable costs associated with the landlord's removal of the property, and (c) effects the removal within 72 hours of the tender. Civ. § 1965(a)(1)—(4). If the tenant does not comply, then the landlord may opt to notice a lien sale of the personal property in accordance with the provisions of Civ. § 1988. Under these provisions, the tenant must be given 15 days

7. Given the refusal of the Defendants to return Kaufman's property before any storage charges had accrued, and their failure to comply with California law concerning the property, *see* n. 10 *infra.*, it might be persuasively argued that Albino did not have a valid storage lien, and thus, that it violated § 362(a)(3) after it received possession of Kaufman's property. Given the clear stay violation that resulted from the lien sale, the court need not resolve whether Albino's alleged storage lien was valid.

8. Section 542(a) provides, in relevant part:

Except as provided [in various subsections not relevant here] an entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

9. Section 722 provides:

An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

notice of a right to reclaim; absent timely reclamation, the property may be sold.

Here, Defendants contend that because Kaufman did not pay storage costs within 15 days of her eviction, they were not bound by the automatic stay. Patently, this was not so. Kaufman, as mentioned, owned the personal property in question at the date of her chapter 13 petition, the filing of which triggered the automatic stay. Section 362(a). Given Kaufman's ownership at the date of the petition, California law, of course, did not and could not prevent the automatic stay from becoming effective to stay any further lien enforcement. U.S. Const. Art. VI, cl. 2 (the supremacy clause). Nor does anything under California law purport to permit a lienholder to sell personal property in violation of the automatic stay. *See In re Ramirez*, 183 B.R. 583, 588–89 (9th Cir. BAP 1995) (holding that property levied upon prepetition is included in the estate, and that any postpetition lien sale is therefore stayed by § 362(a)).[10]

Apart from the above, Defendants kept for themselves the excess proceeds of the lien sale, property to which Kaufman was legally entitled pursuant to Civ. § 1988(c). This too, violated the automatic stay. Section 362(a)(3).

For the foregoing reasons, the court holds that Defendants violated the automatic stay by, among other things, selling or causing the sale of Kaufman's property on August 7 and 8, 2000, and by retaining the excess proceeds of the lien sale.

## C. *DEFENDANTS' VIOLATION OF THE AUTOMATIC STAY WAS WILLFUL*

 Section 362(h) provides: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." For purposes of § 362(h), "willful" does not mean that the party causing injury had a specific intent to violate the stay; rather all that is required for a finding that a violation was willful is that the defendant knew of the automatic stay and that the defendant's actions that violated the stay were intentional. *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989) (internal citations omitted); *In re Pinkstaff*, 974 F.2d 113, 115 (9th Cir.1992). For this purpose, "[k]nowledge of the bankruptcy is the legal equivalent of knowledge of the automatic stay provided under § 362." *Bloom*, 875 F.2d at 227.

 Here, Monte, representative of Polo and Coast, testified that Polo and Coast had no knowledge of the bankruptcy at the time of the lien sale that Albino conducted. Monte was not telling the truth when he so testified. (Indeed, much of the testimony presented by Defendants was lacking in credibility; *see infra*.)

On August 4, 2000, three days before the sale began, Seidler, eviction counsel for Polo and Coast, signed a document on behalf of Polo, in this very bankruptcy case, entitled "Request for Special Bank-

---

**10.** Moreover, even under California law and outside of any bankruptcy considerations, the passage of the 18 day period under Civ. § 1965(a), applicable after an eviction via CCP § 1174(h), does not divest the owner of ownership or a final opportunity to redeem the property prior to sale. Civ. § 1987 entitles the owner to avoid a forced sale by tendering, anytime prior to sale, the reasonable costs of storage, advertising and sale. Thus, at the time of the chapter 13 petition, Kaufman retained these rights, which Defendants could not abrogate in contravention of § 362(a).

In addition, Defendants never gave Kaufman notice of the lien sale to be conducted by Albino, in violation of Civ.1988(b), applicable via CCP § 1174(i).

ruptcy Notice." The Request for Special Bankruptcy Notice included the proper case caption with Kaufman's name, complete with the case number, and requested that all notices for Polo in this bankruptcy case be sent to Seidler. (According to Kaufman, her bankruptcy counsel, Duane Tucker, had faxed the details about the bankruptcy filing to Seidler, Monte, Polo, and Coast.) On the same day, Seidler's office, in receipt of the information concerning Kaufman's bankruptcy filing, served a copy of the Request for Special Bankruptcy Notice on Tucker, Kaufman's chapter 13 trustee, and the U.S. Trustee.

Michael Albino ("M. Albino"), representative of Albino, testified at trial that he was not aware of the bankruptcy at the time of the lien sale. The court does not believe that M. Albino was telling the truth: he admitted that Kaufman and a Mr. Brosnan had given him some papers on the evening of the first day of the lien sale and told him that the sale had been stayed. M. Albino testified that although he had these papers, the title to which he could not remember, he had concluded at the time that they were not "clear and conclusive," and in any event, that Coast had told him that it was OK for him to proceed with the lien sale. Therefore, he proceeded.

The court finds that each Defendant's violation of the automatic stay was willful within the meaning of § 362(h).

### D. ACTUAL DAMAGES.

■ Because Defendants willfully violated the automatic stay, Kaufman is entitled to actual damages. Section 362(h); *Ramirez*, 183 B.R. at 589 (award of actual damages, costs, and fees is mandatory under § 362(h) upon a finding of a willful violation). The basic measure of damages is the amount of the economic loss Kaufman suffered as the proximate result of

Defendants' violation, taking into account the fair market value of the property that they disposed of in violation of the stay, *In re Dawson*, 367 F.3d 1174, 1179 (9th Cir. 2004), and any other factors relevant to making Kaufman economically whole. *See, e.g., In re Walters*, 41 B.R. 511, 516–17 (Bankr.W.D.Mo.1984). Damages for emotional distress, however, may not be awarded. *Dawson*, 367 F.3d at 1180–81.

■ Here, the evidence as to the amount of Kaufman's economic loss was in substantial conflict.

The parties agree that the Residence was a large, six bedroom four and one-half bathroom, upscale home in a fashionable neighborhood, and that Kaufman had fully furnished the Residence.

Kaufman testified that she had paid several million dollars to furnish the Residence, but produced no receipts, and that she had insured the contents of the Residence for approximately $1,478,000, but produced no insurance policy. In her Schedule B (personal property), Kaufman scheduled the fair market value of her household furnishings, household books, pictures and collectibles, clothing, miscellaneous possessions, and office equipment, under oath, as $450,000.

Kaufman also testified that many of the items in the Residence were valuable antiques, including a 15th Century pine armoire worth $28,000, or were rare and expensive, including by way of example goose down sofas valued at $18,000 and an antique mirror worth $6,000. *See* trial Exhibit 1.

Additionally, Kaufman testified that she had paid $165,000 to produce the business materials that Albino had taken and tossed in the garbage; in her schedules she valued same at $250,000.

M. Albino testified that he had inspected the property prior to sale, and that the

alleged antique armoire was a fake. Albino's auction contract with Coast; Exhibit M, stated that Albino's estimated commissions for the sale would be $12,800 based on expected sale returns of $32,000. The sale actually produced gross proceeds of $24,599.50.[11]

These amounts, however, do not establish fair market value because the lien sale was not a commercially reasonable sale designed to garner market value. Advertising was limited to a single line in the jobber/wholesaler section of a newspaper. Many works of art and items of furniture appear to have been dumped for amounts less than $25. Many items were randomly and indiscriminately lotted together without description.[12]

In addition, the only amounts Albino could permissibly recover from the lien sale were the expenses of sale and storage; Kaufman was entitled to any excess. Civ. § 1988(c). Thus, Albino had absolutely no economic incentive to maximize the returns from the lien sale.[13] And, under paragraph 10 of its fee schedule contract with Coast, Albino was obliged to place any unsold goods in a subsequent auction. Thus, Albino had every economic incentive to dispose of Kaufman's property as soon as possible.

The court cannot determine the value of the property Defendants sold in violation of the automatic stay with mathematical precision. If the court were to begin with Albino's initial estimate of $32,000, a floor would be established. But this amount is well below market value for the reasons discussed above. *See In re Rivers*, 160 B.R. 391, 393 (Bankr.M.D.Fla.1993) (holding that an auction of debtor's personal items for sole purpose of liquidating the property as soon as possible did not establish market value).

If, then, the court were to look at the valuation in Kaufman's schedules ($450,000), then a ceiling would be established. The court believes, however, that the valuation in the schedules is too high, especially in light of Kaufman's trial testimony and trial exhibits, which placed an undue emphasis on replacement values and cost, rather than market value.

As to the contents of the Residence, M. Albino testified that he had prepared a presale inventory and gave it to Coast, but Defendants did not introduce it into evidence. M. Albino stated that the inventory was the same as the lien sale report, but without the sale figures. The court, however, does not believe M. Albino: Exhibit U, the document M. Albino testified was the same as the presale inventory, is dated March 4, 2004, well after the bankruptcy, and sets forth lot numbers, buyer numbers, commission numbers, and prices

---

**11.** Defendants also introduced into evidence an unsigned summary of schedules Kaufman had filed in connection with a prior bankruptcy filing in 1999, which said her personal property was worth "125K." The court believes that this summary is essentially meaningless in the present context because the actual schedules to which the summary related were not presented at trial, nor was any signature. (For example, the "125K" may not have included items that were assigned no value or a value of "unknown" as is not uncommon in the preparation of bankruptcy papers.)

**12.** Some of the entries on the lien sale report, not atypical, are as follows (Exhibit U):

| | |
|---|---|
| Five prints, shades, mirror | $5 |
| 3 Boxes Misc. | $20 |
| Box of Misc. and vacuum | $10 |
| Lot of Beds and Frames | $10 |
| 5 prints | $5 |
| 12 pieces of misc. | $15 |
| 2 VCRs | $10 |
| Wagon of toys and can of toys | $5 |
| Rugs | $7.50 |
| Stereo | $15. |

**13.** Albino had estimated prior to the sale that there would be a surplus over expenses and charges. *See* Exhibit M.

at which items were sold. Neither this document nor anything similar to it could have existed prior to the sale. No inventory was presented into evidence, or presumably prepared, by any Defendant that detailed the contents of the Residence before they were sold at the lien sale, or that described the contents in other than the most general terms.

Kaufman, however, was able to recount the contents of the Residence in far more detail, based on her recollection, conversations with Hasbrook Interiors (one of the vendors from which she had purchased many of the more-expensive furnishings), and her visit to Albino's premises prior to conclusion of the lien sale. This evidence showed that the furnishings for the Residence included those necessary to tastefully furnish an upscale home consisting of 5,230 square feet that included a living room, six bedrooms, four and one-half bathrooms, a formal dining room, a family room, an entry-way and hall, a kitchen, and a niche area that Kaufman had furnished. Even Defendants so admit.

According to Kaufman, some of these rooms were furnished with expensive area rugs, lamps, artwork, vases, and other appointments that Albino sold. Kaufman's trial Exhibit 24 showed that some of her home furnishings were featured in an advertising brochure by Hasbrook Interiors and Antiques. The furnishings in the house are detailed in Exhibit 1. *See also* Exhibit 9.

In the court's view, therefore, a review of the contents of the Residence, with downward adjustments of the replacement values or cost amounts for the contents, per Kaufman's testimony, produces a more reliable indication of fair market values than any evidence Defendants submitted, and as previously stated, a more reliable conclusion than the extremes represented by the lien sale proceeds and Kaufman's schedules.

Kaufman's living room contained at least 10 large items of expensive furniture, plus an area rug, lamps, artwork, and appointments. A fair value of $25,000 is reasonable. Her dining room also had at least 10 large items of expensive furniture, plus a valuable area rug and valuable chandelier. A fair value of $30,000 is reasonable. Using the same methodology, the court assigns a value of $4,000 per bedroom for a total of $24,000 for the six bedrooms, a value of $7,000 for the items in the entryway and hall, a value of $10,000 for the items in the kitchen, and a value of $2,000 for the items in the niche. The foregoing amounts total $98,000.

Kaufman testified that she had attempted without success to repurchase her clothing, which Albino had sold at the lien sale, for $6,000 and had offered this amount to the buyer at the lien sale (whose name had been provided to Kaufman by Albino). The court will adopt this amount as the market value thereof.

Albino sold numerous additional items, including, by way of example only, holiday decorations, fabric, appliances, cameras, other electronic and computer equipment, pillows, jewelry, sheets, towels, music tapes, travel souvenirs, grills, train sets, and dolls. The court will add an additional $12,000 for these items.

The total of all foregoing amounts is $116,000. The court therefore holds that, for purposes of § 362(h), Kaufman suffered actual damages in the sum of $116,000.[14]

---

**14.** The court has not assigned any value to Kaufman's business materials. The boxes and contents do not appear to have any market value of significance that Kaufman was able to prove.

### E. PUNITIVE DAMAGES.

 Section 362(h) provides that a debtor injured by a willful violation of the automatic stay may recover punitive damages "in appropriate circumstances." Although the Bankruptcy Code does not specify the circumstances that are appropriate, general case law regarding punitive damages does. As the Ninth Circuit stated in *Professional Seminar Consultants v. Sino American Tech. Exchange Council, Inc.*, 727 F.2d 1470, 1473 (9th Cir.1984):

> The fact finder has considerable discretion in fixing damages. The factors to be considered are (1) the nature of the defendants' acts; (2) the amount of the compensatory damages awarded; and (3) the wealth of the defendants. (Internal citation omitted.)

In addition, the Supreme Court has observed that the purpose of punitive damages in civil cases is the governmental one of deterrence and retribution, and has held that due process dictates that punitive damage awards not be grossly excessive or arbitrary. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996); *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003).

Here, the court will award punitive damages to Kaufman, in the following amounts against the following defendants:

Polo—$450,000 (approximately 3.9 times actual damages);

Monte—$240,000 (approximately twice actual damages);

Coast—$50,000 (approximately .4 times actual damages); and

Albino—$15,000 (approximately .13 times actual damages).

In arriving at the foregoing amounts, the court has taken into account the following:

### 1. Defendants' Acts.

 In *BMW*, 517 U.S. at 575, 116 S.Ct. at 1589, the Supreme Court said, "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendants' conduct." Here, the misconduct of Defendants, from the time of the eviction and continuing after the bankruptcy filing to and after the dates of the lien sale, was not only unlawful, intentionally so, but cruel.

To address this issue appropriately, the court will need to set forth some additional background facts. Immediately after the eviction, on July 7, 2000, Kaufman demanded in writing that Coast restore her personal property. Exhibit 9. Polo and Coast, through Monte, could have done so without incurring so much as a dime of storage charges, yet refused.

Kaufman introduced into evidence a series of letters all but begging for return of her property. Monte denies that he received them, but the court does not believe Monte. Kaufman testified that Monte kept assuring her that she could eventually retrieve her property, but warned her that she should not show up at the Residence without his permission or that she would be subject to arrest.

Believing that Monte intended to allow her to retrieve her property, Kaufman prepared and provided Monte with a moving schedule. Exhibit 12. On July 12, 2000, Kaufman rented a storage facility at which she intended to store the property after she retrieved it. Exhibit 16. Even so, Monte's permission to remove the furniture, artwork, and most of Kaufman's other property at the Residence never came.[15]

15. Monte did permit Kaufman to remove her five-year-old child's clothing and some per-

Monte testified that he had attempted to persuade Kaufman to remove the property, and that she had not done so. He said that Kaufman wanted to make multiple trips to retrieve property, but that he did not want to suffer the bother of having to show up on multiple occasions to supervise Kaufman while she was there. Thus did Kaufman come to lose her life's possessions.

What Kaufman did not then know is that at some point before Monte caused the removal of Kaufman's personal property from the Residence, Monte had moved into the Residence himself, part time, and also allowed his son to use the Residence for his own purposes. (Monte testified that he and his son had done so to secure the contents of the Residence.)

Then, without advance notice to Kaufman of any kind, Monte arranged for Albino to remove, and Albino did remove, the personal property from the Residence.

Peter Cline, President of Coast ("Cline"), testified that Coast had offered Kaufman between $3,000 to $5,000 to assist in the removal and storage of her property, and that she refused. Gregory Abel, another employee of Coast, testified that Coast offered Kaufman $25,000 to assist in the removal and storage of her property, and that she had refused.[16] Kaufman testified that she received no such offers of assistance.

The court does not believe either Cline or Abel. Their testimony on behalf of Coast is conflicting, and makes no sense in light of Kaufman's frantic efforts to obtain possession of her property before Coast carted it off to Albino.

After Polo acquired title to the Residence, Polo transferred it to a legal client of Seidler, who decided he didn't want it. The client then transferred it to Monte in his personal capacity. Monte testified that he assumed permanent occupancy of the Residence in March 2002. Monte knew that three items of furniture remained at the premises, and he kept them for his own. (At trial, Monte offered to return them to Kaufman.)

After Kaufman filed her chapter 13 petition, Defendants never gave Kaufman a reasonable opportunity to retrieve her property, never gave her notice of the lien sale, and never presented her with a storage or expense bill to pay and thereby avoid the lien sale. (Kaufman testified that, with the assistance of a friend, she had the funds to pay any such bill.)

Polo knew of the bankruptcy before the lien sale. Polo also knew, before the lien sale, that the automatic stay was in effect: Polo's bankruptcy counsel, Seidler, is well experienced in the representation of creditors in consumer bankruptcy cases, and Coast, Polo's agent, also has substantial experience in bankruptcy cases. Yet they did not stop the lien sale, electing to ignore the automatic stay. Cf. In re Abrams, 127 B.R. 239, 243–44 (9th Cir. BAP 1991) (creditor with knowledge of the stay has duty to take reasonable steps to remedy a violation.)

Albino conducted the lien sale with little or no regard for the fact that its purpose was presumably to pay storage charges, all of which charges, as mentioned, could have been avoided if Polo, Coast, and Monte had permitted Kaufman to retrieve her property before they sent it off to Albino. Albino sold not only the items of value that

---

sonal items.

**16.** Cline and Abel said that these offers may have been communicated to Kaufman through her friend, Mr. Brosnan, but in the case of the alleged $25,000 offer, perhaps within Kaufman's earshot.

would have satisfied any reasonable charges that had accrued by the time of the lien sale, but everything else in the Residence that Kaufman owned.

Albino even sold all the toys and playthings of Kaufman's five-year-old child, and did not even have the decency to permit Kaufman to retrieve her personal clothing. Albino discarded many boxes of Kaufman's sales materials for the business she was attempting to start. Albino knew that Kaufman wanted her assets back; Kaufman even attended the second day of the lien sale and successfully bid on several items.[17]

According to Albino's post-lien sale report to Coast, the lien sale produced proceeds of $11,928.25 in excess of its claimed commissions and storage expenses. Either Albino, Polo, or Coast kept this money, to which Kaufman was entitled. Civ. § 1988(c). (M. Albino testified that this particular portion of his report was in error, but produced no corroboration. The court does not believe him.) Nor did Defendants account to Kaufman regarding the sale, or advise her that it had produced excess proceeds.

Defendants argue that punitive damages are inappropriate in light of the factors the Supreme Court mentioned in *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521. In *Campbell*, the Supreme Court said:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evidenced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or

was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

The court disagrees with Defendants' assertion. In assessing punitive damages, the court has taken into account that the damage to Kaufman was economic, not physical, and that any health and safety threat here was not major. On the other hand, there is no question that Kaufman had a "financial vulnerability" that Defendants exploited unmercifully. Nor is there any question that Defendants' misconduct here was not "mere accident," but rather, "the result of intentional malice, trickery, or deceit."

Defendants also argue, inconsistently, that in applying the above-mentioned factors, the court may not take into account Defendants' prepetition misconduct toward Kaufman because § 362(h) is limited to misconduct for violations of the automatic stay, which is not in force prepetition. Again, the court disagrees. Of necessity, the court must consider Defendants' malicious prepetition acts toward Kaufman that lead up to the lien sale to determine whether the sale was a "mere accident," and to determine whether the lien sale was just an "isolated incident."

Here, based on Defendants' course of conduct after the eviction and through the date on which they kept the excess lien sale proceeds, as detailed herein, it is clear that the sale was not an isolated incident, but rather, the culmination of a series of interconnected events designed by Defendants to humiliate Kaufman and to denude her of her personal property for their own economic advantage.

17. Kaufman testified that she learned of the lien sale from a friend, after the first day of auction had been concluded.

■ Finally, Defendants argue that the court must hear evidence as to Polo's and Coast's past history and policies regarding the automatic stay before it may assess punitive damages. The court declines to do so for several reasons. First, in rendering this decision, the court has not assumed that Defendants have been guilty of any prior stay violations. Second, the court rejects any legal notion that the absence of evidence of a defendant's prior misconduct immunizes that defendant from punitive damages. Rather, the court must consider all the relevant factors. *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521.

The court finds that the misconduct of each Defendant warrants the imposition of the punitive damage amounts set forth above.

### 2. *Defendants' Wealth.*

a. *Polo.* According to Cline, Polo owns a $15 million loan portfolio and that a one-percent ownership interest in Polo might be worth $100,000. If so, then Polo is worth approximately $10,000,000.

b. *Monte.* Kaufman did not provide any evidence of Monte's overall wealth. Even so, the court has some information of relevance: Monte testified that as of the time of trial, he was in contract to sell the Residence for approximately $1.9 million, and that the Residence was subject to liens of approximately $1.4 million. Thus, Monte's wealth includes equity in the Residence in the approximate sum of $500,000.

c. *Coast.* The evidence as to Coast was limited. Cline mentioned that Coast might be worth $100,000.

d. *Albino.* Kaufman did not present any evidence as to Albino's wealth.

The court has adjusted the punitive damage awards to reflect the disparity in wealth among the Defendants.

### 3. *Relation to Actual Damages.*

In *BMW*, 517 U.S. at 580, 116 S.Ct. at 1589, the Supreme Court noted, "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." There is no hard and fast rule as to the appropriate relationship that punitive damages should bear to a plaintiff's actual damages. In *Campbell*, 538 U.S. at 410, 123 S.Ct. at 1516, however, the Supreme Court stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." Recently, in *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1041–1045 (9th Cir.2003), the Ninth Circuit took the opportunity to review recent Supreme Court jurisprudence regarding punitive damages, and upheld a punitive damage award that was seven times the plaintiff's actual damages. *Zhang*, 339 F.3d at 1044.

Here, the punitive damage awards are based on multipliers of approximately 3.9 (Polo), 2 (Monte), .4 (Coast), and .13 (Albino), amounts that are well within Constitutional guidelines, and that reflect the degree of the Defendants' misconduct, as tempered by their disparate financial positions.

### 4. *Analogous Civil Penalties.*

The third Constitutional guidepost the Supreme Court mentioned in *BMW*, is "the difference between this remedy [punitive damages] and the civil penalties authorized or imposed in comparable cases." *BMW*, 517 U.S. at 575, 116 S.Ct. at 1589. In applying this guidepost, the Supreme Court has compared the punitive damage award at issue with the amount of any statutory fine that could have been imposed for the misconduct at issue.

In *BMW,* 517 U.S. at 583, 116 S.Ct. at 1589, for example, the Supreme Court noted that the maximum statutory fine for the conduct at issue was $10,000, whereas the punitive damage award was $2 million. Similarly, in *Campbell,* 538 U.S. at 428, 123 S.Ct. at 1526, the Supreme Court held that the $145 million punitive damage award exceeded Constitutional boundaries because, among other things, it grossly exceeded the prescribed $10,000 statutory penalty.

Here, however, the Bankruptcy Code does not prescribe any statutory penalty for violation of the automatic stay. Thus, a comparison is not possible. *See Swinton v. Potomac Corporation,* 270 F.3d 794 (9th Cir.2001). In *Swinton,* the Ninth Circuit discussed the third *BMW* guidepost in the context of a punitive damage award under 42 U.S.C. § 1981 (the "Washington Anti-discrimination Statute") and stated: "... Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983) although it has had ample opportunity to do so ...." *Id.* at 820. The Ninth Circuit also rejected the notion that it should be guided by the $300,000 penalty cap in Title VII cases, and upheld the Constitutionality of a punitive damage award in the sum of $2.6 million, some 8.6 times the Title VII cap. *Id.; see also Zhang,* 339 F.3d at 1044–45.

Here, based on both the traditional factors and the Constitutional guideposts established by the Supreme Court, the court will assess punitive damages against each Defendant as provided above.

### F. ATTORNEYS' FEES.

Because Defendants willfully violated the automatic stay, Kaufman is entitled to an award of attorneys' fees and costs. Section 362(h); *In re Stainton,* 139 B.R. 232 (9th Cir. BAP 1992). The court will liquidate the appropriate amount post-judgment, in accordance with a timely motion by Kaufman pursuant to Civil Local Rule 54–5, applicable herein via Local Bankruptcy Rule 1001–2(51).

### G. CONCLUSION.

On September 3, 2004, the court entered its Judgment in favor of Kaufman, against Polo in the sum of $570,000, against Monte in the sum of $360,000, against Coast in the sum of $170,000, and against Albino in the sum of $135,000 plus, in each case, attorneys' fees and costs. As provided therein, Defendants' liability thereunder is joint and several, provided that no single Defendant's liability shall exceed the amount of the judgment against such Defendant. This Decision (Amended) amends and supercedes the court's Decision filed herein September 3, 2004.

### STATUTORY APPENDIX—SELECTED PROVISIONS OF CALIFORNIA CODES

*Civil Code § 1965(a)*

(a) A residential landlord shall not refuse to surrender, to a residential tenant or to a residential tenant's duly authorized representative, any personal property not owned by the landlord which has been left on the premises after the tenant has vacated the residential premises and the return of which has been requested by the tenant or by the authorized representative of the tenant if all of the following occur:

(1) The tenant requests, in writing, within 18 days of vacating the premises, the surrender of the personal property and the request includes a description of the personal property held by the landlord and specifies the mailing address of the tenant.

(2) The landlord or the landlord's agent has control or possession of the tenant's personal property at the time the request is received.

(3) The tenant, prior to the surrender of the personal property by the landlord and upon written demand by the landlord, tenders payment of all reasonable costs associated with the landlord's removal and storage of the personal property. The landlord's demand for payment of reasonable costs associated with the removal and storage of personal property shall be in writing and shall either be mailed to the tenant at the address provided by the tenant pursuant to paragraph (1) or shall be personally presented to the tenant or to the tenant's authorized representative, within five days after the actual receipt of the tenant's request for surrender of the personal property, unless the property is returned first. The demand shall itemize all charges, specifying the nature and amount of each item of cost.

(4) The tenant agrees to claim and remove the personal property at a reasonable time mutually agreed upon by the landlord and tenant but not later than 72 hours after the tender provided for under paragraph (3).

(b) For the purposes of this chapter, "reasonable costs associated with the landlord's removal and storage of the personal property" shall include, but not be limited to, each of the following:

(1) Reasonable costs actually incurred, or the reasonable value of labor actually provided, or both, in removing the personal property from its original location to the place of storage, including disassembly and transportation.

(2) Reasonable storage costs actually incurred, which shall not exceed the fair rental value of the space reasonably required for the storage of the personal property.

(c) This chapter shall not apply when disposition of the personal property has been initiated or completed pursuant to the procedure set forth in Chapter 5 (commencing with Section 1980) or the occupancy is one defined by subdivision (b) of Section 1940.

*Code of Civil Procedure § 1174(g)—(i)*

(g) The landlord shall store the personal property in a place of safekeeping until it is either released pursuant to subdivision (h) or disposed of pursuant to subdivision (i).

(h) The landlord shall release the personal property pursuant to Section 1965 of the Civil Code or shall release it to the tenant or, at the landlord's option, to a person reasonably believed by the landlord to be its owner if the tenant or other person pays the costs of storage as provided in Section 1990 of the Civil Code and claims the property not later than the date specified in the writ of possession before which the tenant must make his or her claim or the date specified in the notice before which a person other than the tenant must make his or her claim.

(i) Personal property not released pursuant to subdivision (h) shall be disposed of pursuant to Section 1988 of the Civil Code.

*Civil Code § 1987*

(a) The personal property described in the notice shall be released by the landlord to the former tenant or, at the landlord's option, to any person reasonably believed by the landlord to be its owner if such tenant or other person pays the reasonable cost of storage and takes possession of the property not later than the date specified in the notice for taking possession.

(b) Where personal property is not released pursuant to subdivision (a) and the

notice stated that the personal property would be sold at a public sale, the landlord shall release the personal property to the former tenant if he claims it prior to the time it is sold and pays the reasonable cost of storage, advertising, and sale incurred prior to the time the property is withdrawn from sale.

*Civil Code § 1988(b) and (c)*

(b) Notice of the time and place of the public sale shall be given by publication pursuant to Section 6066 of the Government Code in a newspaper of general circulation published in the county where the sale is to be held. The last publication shall be not less than five days before the sale is to be held....

(c) After deduction of the costs of storage, advertising, and sale, any balance of the proceeds of the sale which is not claimed by the former tenant or an owner other than such tenant shall be paid into the treasury of the county in which the sale took place not later than 30 days after the date of sale. The former tenant or other owner may claim the balance within one year from the date of payment to the county by making application to the county treasurer or other official designated by the county ....