**IN RE: Kim Michele VANAMANN, Debtor.**

**Case No.: 09–33809–MKN**

United States Bankruptcy Court, D. Nevada.

Date: April 26 and May 3, 2016 Time: 1:30 p.m.

Signed 08/19/2016

Christopher Patrick Burke, Las Vegas, NV, for Debtor.

MEMORANDUM DECISION ON DEBTOR'S RENEWED MOTION TO HOLD CREDITOR NATIONSTAR MORTGAGE IN CONTEMPT AND FOR SANCTIONS FOR VIOLATION OF THE DISCHARGE INJUNCTION 11 U.S.C. § 524(a)(2) [1]

Honorable Mike K. Nakagawa, United States Bankruptcy Judge

On April 26, 2016 and May 3, 2016, an evidentiary hearing was conducted on the Debtor's Renewed Motion to Hold Creditor Nationstar Mortgage in Contempt and for Sanctions for Violation of the Discharge Injunction 11 U.S.C. § 524(a)(2). ("Contempt Motion"). The appearances of counsel were noted on the record. After the close of the evidentiary record, counsel filed post-hearing briefs on June 17, 2016, and the matter was deemed submitted.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law pursuant to FRBP 9014 and FRBP 7052, as well as FRCP 52.

## BACKGROUND

On December 22, 2009, Kim Michele Vanamann ("Debtor") filed a voluntary Chapter 13 petition. The case was assigned to panel Chapter 13 trustee, Rick A. Yarnall. On her real property Schedule "A," Debtor listed a home located at 7593 Slip Stream [sic] Street, Las Vegas, Nevada 89139 ("Slipstream Property"). On her Schedule "D," Debtor listed Bank of America Home Loan Servicing ("BOA") as having a claim in the amount of $229,000 secured by a first mortgage against the Slipstream Property as well as an additional claim in the amount of $29,000 secured by a second mortgage against the same property. On her monthly income Schedule "I," Debtor listed her earnings as a bartender plus her receipt of child support.

On March 11, 2010, a proof of claim ("POC") in the secured amount of $223,176.93 was filed on behalf of BAC Home Loans Servicing, LP, fka Countrywide Home Loans Servicing, LP. Attached to the POC is a copy of a Note dated August 1, 2004, in the principal amount of $239,100.00, that is signed by the Debtor ("Promissory Note"). Also attached to the POC is a copy of a Deed of Trust against the property that is signed by the Debtor.

On March 15, 2010, BOA filed an objection to confirmation of the Debtor's proposed Chapter 13 plan. (ECF No. 25).

On April 22, 2010, an order was entered confirming the Debtor's amended Chapter 13 plan. (ECF No. 29).

On January 19, 2012, BOA as successor by merger to BAC Home Loans Servicing LP, filed a stipulation for the Debtor to make adequate protection payments and for termination of the automatic stay upon breach of such payments. (ECF No. 43). On January 25, 2012, an order was entered approving that stipulation ("Adequate Protection Order"). (ECF No. 44).

On November 30, 2012, U.S. Bank, National Association ("USB") filed a notice that the Adequate Protection Order had been breached, requesting that the delinquent payments be sent to USB in care of BOA's counsel. (ECF No. 55).

---

1. In this Memorandum Decision, all references to "ECF No." are to the numbers assigned to the documents filed in the above captioned case as they appear on the docket maintained by the clerk of the court. Documents filed in other bankruptcy proceedings also will be signified as appropriate by docket numbers. All references to "Section" or "§" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "FRCP" are to the Federal Rules of Civil Procedure.

On December 5, 2012, Debtor filed an amended Schedule "I" disclosing a reduction in monthly income as she was no longer receiving child support. (ECF No. 56).

On December 11, 2012, Debtor voluntarily converted her Chapter 13 proceeding to Chapter 7. (ECF No. 57).

On December 12, 2012, David A. Rosenberg was appointed as the Chapter 7 trustee ("Trustee"). (ECF No. 60).

On December 13, 2012, Debtor filed a notice of change of address from the Slipstream Property to 5353 S. Jones Boulevard, #1035, Las Vegas, Nevada 89119, with a telephone number of (702) 343-3438. (ECF No. 62).

On December 27, 2012, an order was entered in favor of USB terminating the automatic stay on the Slipstream Property. (ECF No. 66).

On January 3, 2013, Debtor filed an amendment correcting her new zip code to 89118. (ECF No. 70).

On May 1, 2013, a Discharge of Debtor was entered ("Discharge Order") (ECF No. 78), a copy of which was served on BOA as well as all other creditors. (ECF No. 79).

On October 22, 2013, the Trustee filed a motion to sell the Slipstream Property free and clear of liens, or, in the alternative, subject to all liens ("Sale Motion"). (ECF No. 80). The motion was noticed to be heard on November 21, 2013, and it was served on BOA, as well as its counsel of record. (ECF No. 84).

On October 31, 2013, Debtor filed her Motion to Hold Bank of America in Contempt, etc. ("BOA Contempt Motion"), for continuing to send billing statements to her after she filed her bankruptcy petition and after she received her discharge. (ECF No. 86). The matter was noticed to be heard on December 4, 2013. (ECF No. 87).

On November 1, 2013, a request for special notice was filed by the law firm of McCarthy & Holthus, LLP ("McCarthy & Holthus"), stating that it "has been retained by U.S. Bank National Association, as Trustee for CSMC Mortgage Loan Trust 2007–2 by and through its servicing agent Bank of America, N.A. in the above-referenced bankruptcy case." (ECF No. ·89).

On November 7, 2013, McCarthy & Holthus filed an opposition to the Sale Motion as "attorney for U.S. Bank National Association as Trustee for CSMC Mortgage Loan Trust 2007–2 by and through its servicing agent Bank of America, N.A." (ECF No. 91).

On November 21, 2013, the Sale Motion was heard and granted over BOA's objection.

On November 22, 2013, McCarthy & Holthus filed as "attorney for secured creditor Bank of America, N.A.," a stipulation to continue the hearing on the BOA Contempt Motion to December 11, 2013. (ECF No. 92). The stipulation also sought an extension of time to respond to that motion. On November 25, 2013, an order was entered approving the stipulation. (ECF No. 93). On the same date, McCarthy & Holthus filed the opposition to the BOA Contempt Motion on behalf of "Bank of America, its assignees and/or successors." (ECF No. 95). On December 4, 2013, Debtor filed a reply ("Reply"). (ECF No. 98).[2]

---

**2.** In the BOA Contempt Motion, Debtor alleged that after she vacated the Slipstream Property and after she received her discharge on May 1, 2013, BOA continued to send her notices and statements attempting to collect the loan and to charge her for

On December 11, 2013, the hearing on the BOA Contempt Motion was continued to January 28, 2014. (ECF No. 101).

On December 13, 2013, an order was entered granting the Trustee's Sale Motion ("Sale Order"), with the order having been approved by McCarthy & Holthus as counsel for "U.S. Bank National Association as Trustee for CSMC Mortgage Loan Trust 2007-2 by and through its servicing agent Bank of America, N.A." (ECF No. 102). The Sale Order was never appealed nor was a stay of the order pending appeal ever sought.

On December 26, 2013, the Trustee filed a report stating that the buyer of the Slipstream Property was purchasing the property subject to all existing liens and encumbrances for a purchase price of $3,000. (ECF No. 103).

On January 21, 2014, McCarthy & Holthus as "attorney for U.S. Bank National Association, as Trustee for CSMC Mortgage Loan Trust 2007-2, its assignees and/or successors, by and through its servicing agent Nationstar Mortgage, LLC," filed a stipulation to withdraw with preju-

dice the BOA Contempt Motion ("Withdrawal Stipulation").[3] (ECF No. 104).[4]

On January 22, 2014, an order was entered approving the stipulation (ECF No. 105) and the continued hearing on the BOA Contempt Motion was vacated from the calendar. (ECF No. 106).

On January 23, 2014, McCarthy & Holthus as attorney for "U.S. Bank National Association, as Trustee for CSMC Mortgage Loan Trust 2007-2, its assignees and/or successors, by and through its servicing agent Nationstar Mortgage, LLC," filed a notice of entry of the order approving the Withdrawal Stipulation. (ECF No. 107).

On March 7, 2014, an order was entered approving the Trustee's final report in the case. (ECF No. 111).

On August 12, 2014, a final decree was entered closing the Debtor's bankruptcy case. (ECF No. 114).

On September 26, 2015, Debtor filed a motion to reopen her bankruptcy case for the purpose of seeking contempt sanctions against Nationstar Mortgage, LLC ("Nationstar"). (ECF No. 116).[5] The motion

---

lender-placed insurance on the Slipstream Property. See BOA Contempt Motion at ¶¶ 17–23. In support of the motion, Debtor submitted a declaration attesting that she visited her bankruptcy attorney several times regarding the notices and statements from BOA, that she incurred gasoline expenses traveling to her attorney's office, that increased emotional strain and anxiety has led her to make several visits to her doctor, and that she has taken prescription medication because of the increased stress. See Declaration of Kim Michele Vanamann at ¶¶ 30–36 (ECF No. 86–1). For BOA's alleged violation of the discharge injunction, Debtor sought an "attorney sanction of $15,000," attorney fees of $3,500, and emotional distress damages of $10,000, plus actual damages for travel costs to her attorney and reimbursement for doctors' visits and prescriptions. See BOA Contempt Motion at 14:17 to 15:2. After BOA filed opposition to the contempt motion,

Debtor's reply asserted that BOA continued to send her collection statements even after the contempt motion was filed. See Reply at 3:11 to 4:9.

3. The Withdrawal Stipulation represented that the BOA Contempt Motion had been settled, but the terms of the settlement were not disclosed.

4. While the law firm masthead at the top of the first page of the Withdrawal Stipulation represents that the McCarthy & Holthus law firm is acting as attorney for Nationstar, the signature line on page 2 of the same document represents that the law firm is acting as attorney for BOA.

5. In addition to reopening her bankruptcy case, Debtor sought to have Nationstar held in contempt for violating the discharge injunction and to be reimbursed the $260.00 fee

was noticed to be heard on October 28, 2015. (ECF No. 118). Notice was served on Nationstar at multiple locations as well as to McCarthy & Holthus. (ECF No. 120).

On October 21, 2015, Nationstar filed opposition to the motion to reopen through the law firm of Kravitz, Schnitzer & Johnson, Chtd. (ECF No. 122).

On October 28, 2015, the court granted Debtor's request to reopen the case but continued the sanction request for a status hearing to be held on November 18, 2015. (ECF No. 123).

On November 12, 2015, an order was entered reopening the Debtor's bankruptcy case. (ECF No. 124).

On November 23, 2015, an order was entered approving the parties' stipulated scheduling order and discovery plan. (ECF No. 126). That stipulation allowed the Debtor to file a renewed contempt motion ("Renewed Contempt Motion") no later than March 2, 2016, and for a response and a reply. Discovery by both parties was required to be completed no later than February 12, 2016.[6]

On January 28, 2016, an order was entered scheduling an evidentiary hearing for April 26, 2016, and setting various deadlines for submission of witness lists and exhibits. (ECF No. 127).

On March 2, 2016, Debtor filed her Renewed Contempt Motion. (ECF No. 129).[7] On March 23, 2016, Nationstar filed a response to the renewed motion. (ECF No. 136).[8] On April 13, 2016, Debtor filed her reply. (ECF No. 147).

On April 22, 2016, Debtor filed her list of exhibits and witnesses. (ECF No. 156).

On April 22, 2016, Nationstar filed a trial statement (ECF No. 157), a witness list (ECF No. 158), and an exhibit list (ECF No. 159).

On June 17, 2016, Debtor filed her post-hearing brief ("Debtor Closing Brief") (ECF No. 171), and Nationstar filed its post-hearing brief ("Nationstar Closing Brief") (ECF No. 170).

## EVIDENTIARY RECORD

Two witnesses testified at the evidentiary hearing and were subject to cross-examination. Forty–six exhibits, some dupli-

---

paid to reopen the case. Additionally, the prayer of the motion sought $37,500 in "sanctions," $100,000 in punitive damages, $100,000 in emotional distress damages, $300 as reimbursement of costs for travel to her attorney's office, unspecified attorneys' fees and costs, and an order barring Nationstar from sending any further billing statements.

6. As a contested matter, the discovery rules applicable in adversary proceedings were applicable to the Renewed Contempt Motion. See FED.R.BANKR.P. 9014(c). The exhibits admitted at the evidentiary hearing include interrogatories and document requests from both parties under FRCP 33 and 34. It appears that neither party took depositions under FRCP 30 or sought admissions under FRCP 36, and that Nationstar did not seek to take a physical or mental examination of the Debtor under FRCP 35.

7. In addition to the relief sought in the original motion, the Renewed Contempt Motion sought an additional $24,000 for the communications received from Nationstar after the original motion was filed. The prayer further sought an additional $200 in costs to the Debtor for travel to her attorney's office.

8. On April 4, 2016, Nationstar filed a motion to strike a physician from the Debtor's list of witnesses because the witness was not disclosed timely. (ECF No. 138). An order was entered shortening time so that the motion to strike could be heard on April 20, 2016, i.e., six days before the commencement of the evidentiary hearing. (ECF No. 145). Rather than delay the commencement of the evidentiary hearing, Debtor agreed to withdraw the physician from the witness list, thereby rendering moot the motion to strike. Counsel agreed that only the Debtor and a representative of Nationstar would testify at the hearing.

cates of each other, were admitted into evidence.

## A. Exhibits Admitted at Trial.[9]

1. Correspondence and Statements from Nationstar to the Debtor

2. Correspondence and Statements from Nationstar to the Debtor

3. Correspondence and Statements from Nationstar to the Debtor

4. Fees paid by Debtor

6. Renewed Contempt Motion filed March 2, 2016

7. Discovery Responses from Nationstar

8. Bankruptcy docket excerpt, Case No. 09–33809–MKN

9. Discharge of Debtor

10. Sale Order

11. Withdrawal Stipulation

13. Notice of Change of Address

14. Certificate of Service

15. Declaration of Kim Michele Vanamann filed October 31, 2013, and Declaration of Kim Michele Vanamann filed December 4, 2013 in support of BOA Contempt Motion.

16. Bankruptcy docket excerpts, Case No. 09–33809–MKN

A. Welcome correspondence

B. Insurance Notice

C. Insurance Placement Notice

D. Insurance Placement Reminder Notice

E. Lender Placement Insurance Notice

F. Past Due Notice

G. Lender Placed Insurance Notice

H. Mortgage Loan Statement

I. Loss Mitigation Options Notice

J. Past Due Notice

K. Past Due Notice

L. Foreclosure Options Notice

M. Mortgage Loan Statement

N. Informational Statement

O. Informational Statement

P. Informational Statement

Q. Point of Contact Letter

R. Informational Statement

S. Informational Statement

T. Informational Statement

U. Informational Statement

V. Informational Statement

W. Informational Statement

X. Lender Placed Insurance Notice

Y. Informational Statement

Z. Lender Placed Insurance Notice

AA. Informational Statement

BB. Informational Statement

CC. Informational Statement

DD. Informational Statement

JJ. Discovery Responses from Debtor [10]

---

**9.** Debtor's exhibits were marked numerically while Nationstar's exhibits were marked alphabetically. Only the exhibits admitted into evidence, by stipulation or otherwise, are listed using the descriptions of the parties.

**10.** As previously noted at 8, Nationstar objected to the Debtor calling a physician to testify at the evidentiary hearing. According to the Debtor's responses to interrogatories admitted as Exhibit JJ, the Debtor intended to call Dr. Kathleen Cansler, M.D., to testify about the Debtor's health. Additionally, those interrogatory responses identify the physician's prescription of Xanax as the primary medical

treatment received in response to the emotional strain, stress, emotional distress, anxiety, humiliation, and loss of sleep alleged in the Renewed Contempt Motion. Apparently, Debtor also intended to introduce the medical records maintained by Dr. Cansler. As a result of Nationstar's objections, neither the testimony of Debtor's physician nor the Debtor's medical records have been admitted into evidence. Likewise, Nationstar has offered no percipient or expert witness testimony to dispute the Debtor's testimony. Thus, as a further result, any findings on the general damages claimed by the Debtor in the form of

KK. Sale Order

## B. Live Witness Testimony.

The only witnesses who testified were the Debtor and a representative of Nationstar. No other witness testimony was offered by deposition or other means.

### 1. Andrew J. Loll ("Loll").

Loll is a vice president of Nationstar with the most knowledge of all areas of loan servicing, including loans acquired from other entities. He has been with Nationstar or its predecessor since 2002. Loll testified that he has been deposed hundreds of times, has testified in court hundreds of times, and has testified more than ten times regarding post-discharge issues. Loll testified that Nationstar services approximately 2.5 million loans, but he does not know how many are involved in bankruptcy proceedings. At Nationstar's office in Lewisville, Texas, he directly oversees approximately fourteen employees who handle discharge issues and indirectly oversees approximately fifty employees.

Loll acknowledged that a bankruptcy discharge precludes Nationstar from attempting to collect personally from a debtor, and he also understands the effect of a reaffirmation of debt. He testified that if a loan is modified after the debtor receives a discharge, Nationwide will send monthly billing statements setting forth the monthly payment due, the total amount due, and the date payments are due. Loll testified that if a debt is reaffirmed, Nationstar will treat a subsequent default the same as any collection matter.

Loll testified that during the collection process, Nationstar sometimes will call the borrower if the borrower is late or delinquent. If the borrower cannot be reached by telephone, a "skip trace" sometimes will be initiated to locate the borrower. He testified that a skip trace may be used simply to find out if the borrower has left the property for some reason, e.g., has been hospitalized or incarcerated, and not necessarily to try to collect the obligation.

Loll testified that he reviewed all of the documents in the Debtor's loan file and determined that the Slipstream Property had been purchased at foreclosure by Wishing Well, LLC.[11] He testified that the file was received from BOA some time in early December 2013. Loll does not know if there was a phone number in the file for the Debtor, although the file reflects a Bank of America "Code 71" which means that phone calls to the borrower are to cease and desist. Nationstar uses "Code 61" to signify the same. Loll testified that a cease and desist notation in the file only prohibits phone calls from being made to the borrower, but does not prohibit billing statements from being sent.

Loll testified that after Nationstar receives a loan file, it takes many steps in various stages to validate the information. For example, there may be custodial files that contain the original loan documents as well as bankruptcy information. There is loan servicing information that is digitally

---

emotional distress must be based almost entirely on the credibility of her testimony.

**11.** Loll also testified that Wishing Well is in its own bankruptcy proceeding and that Nationstar is aware of that proceeding. The court takes judicial notice that an entity known as Wishing Well Property Investments, LLC, Series 1, commenced Case No. 15–10525–ABL, in this judicial district on February 4, 2015. Nationstar appears on the creditor mailing matrix for Wishing Well and on the list of creditors holding the twenty largest unsecured claims. The Slipstream Property is listed on the Wishing Well real property Schedule "A" as an asset of that bankruptcy estate and U.S. Bank is listed as the holder of a first mortgage on secured creditor Schedule "D." (Wishing Well ECF No. 17).

imaged, and there may be other physical files as well.

Loll testified that when Nationstar received the file from BOA on or about December 12, 2013, Nationstar knew that the Debtor was in bankruptcy, that BOA had sought relief from stay, and that the Debtor had already received a discharge. He testified that upon receipt of the file, Nationstar was required by the Real Estate Settlement Procedures Act ("RESPA") to send a welcoming letter notifying the Debtor that the loan had been transferred. He testified that Nationstar also was aware that BOA had received relief from the automatic stay. Loll acknowledged that the Slipstream Property was sold at foreclosure in January 2014, but attested that Nationstar was not aware of the sale until much later.[12]

Loll acknowledged that after the Debtor received her discharge, she no longer owed any money to Nationstar. He testified that continuing to send monthly billing statements was permissible depending on the reason for doing so. Loll testified that all of the billing statements contained language stating that they were informational only and had limited or no application if the borrower was in bankruptcy or had obtained a discharge. He noted that the language also directed the recipient of the statement to contact Nationstar if the recipient had any questions or no longer wished to receive the statements. Loll acknowledged that the statements were entitled "Mortgage Loan Statement" and then the title changed in February 2015, to "Informational Statement." He further acknowledged that the tear off payment slips attached to the bottom of each statement changed in February 2015, to say "Voluntary Payment Coupon."[13] Loll also testified that Nationstar does not intend to collect personally from borrowers after they receive a discharge in bankruptcy.

Loll acknowledged that Nationstar sent numerous monthly billing statements to

12. Loll acknowledged that Nationstar sent a letter to the Debtor dated December 24, 2014, informing her that she was 1271 days delinquent and had not made recent payments from July 2014 through December 2014. That letter, which was dated two days after the December 22, 2014, Mortgage Loan Statement issued by Nationstar, also states that the Debtor is required to pay $73,803.36 to bring the loan current. At the bottom of the letter, in fine print, it states that Nationstar's communication is "not an attempt to collect a debt from you personally to the extent that it is included in your bankruptcy or has been discharged, but is provided for informational purposes only." Loll also acknowledged that Nationstar sent another letter dated December 26, 2014, notifying the Debtor that Nationstar may foreclose on the Slipstream Property for past due payments and that foreclosure could be avoided by paying $74,423.57 to bring the loan current. That letter also states that the last full payment on the loan was made on April 23, 2012. The first paragraph of that letter states in bold, capital letters: "IF YOU ARE CURRENTLY IN BANKRUPTCY OR HAVE RECEIVED A DISCHARGE IN BANKRUPTCY, THIS COMMUNICATION IS NOT AN ATTEMPT TO COLLECT A DEBT FROM YOU PERSONALLY TO THE EXTENT THAT IT IS INCLUDED IN YOUR BANKRUPTCY OR HAS BEEN DISCHARGED, BUT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY."

13. The monthly statements sent by Nationstar from January 2014 through March 2016 appear as parts of Debtor's Exhibits 1, 2, and 3. All of the monthly statements, whether entitled Mortgage Loan Statement or Informational Statement, state in enlarged print an "Amount Due." He testified that the Mortgage Loan Statement dated December 22, 2014 (Ex. 1 at 000061), was typical of what borrowers receive whether the borrower is in bankruptcy or not. Likewise, the payment coupons appearing at the bottom of each statement, before and after the coupon was re-titled "Voluntary Payment Coupon," all refer to "TOTAL AMOUNT DUE" as well as "PAYMENT DUE IF RECEIVED ON OR AFTER" a specified date.

the Debtor at an address different from the Slipstream Property, but that the statements were informational only.[14] He testified that even if borrowers do not reaffirm a loan or obtain a loan modification, they may still seek to obtain a loan modification after they receive a discharge. Loll testified that, on almost a daily basis, borrowers file for Chapter 7 and leave their homes, but title is not transferred. He testified that until title is transferred, Nationstar will continue to send information to the borrower because the borrower may wish to move back into the property, negotiate new terms with the investor, or be absent for unknown reasons. Loll ac-

knowledged, however, that the Debtor never entered into discussions with Nationstar to retain the Slipstream Property after discharge. He also testified that Nationstar never received any communications from the Debtor or her attorney concerning her receipt of the monthly statements.

Loll acknowledged that Nationstar sent hazard insurance notices to the Debtor in addition to the monthly billing or informational statements. He testified that the notices do not demand payment from the borrower, but only notifies the borrower of the fee required to maintain the insurance.[15] The monthly payment includes the

14. Loll testified that the statements sent to the Debtor all contain a disclaimer stating the communication is not an attempt to collect a debt "If the debt . . . has been discharged in a bankruptcy proceeding." He testified that the word "if" is used because Nationstar codes its loan files to identify those instances where the borrower has received a discharge. The term "if" is used by Nationstar to guard against situations where its coding is in error. Loll also testified that he initially thought Nationstar used a "hard" coding that put the disclaimer language on all statements for its customers. He stated that he reviewed the records for Nationstar's current customers who were not in bankruptcy from 2013 through 2016, and none of those customers received the disclaimer language. Because its own records demonstrate that Nationstar knows which of its customers actually are in bankruptcy, there appears to be no reason to include these disclaimers in any mortgage or informational statements to customers who have received a discharge.

15. The insurance notices were included in Exhibits 1 and 2, as well as Exhibits B, C, D, E, and G. One notice is dated June 3, 2014, and informs the Debtor that failure to keep insurance in place constitutes a breach of the loan documents. The second page of that notice includes a paragraph in capital letters stating that "IF THE DEBT. . . HAS BEEN DISCHARGED IN A BANKRUPTCY PROCEEDING, BE ADVISED THIS COMMUNICATION IS NOT AN ATTEMPT TO COLLECT THE DEBT AGAINST YOU." Another notice dated October 21, 2014, states that Nationstar

had bought hazard insurance for the Debtor and added the cost to her loan account. There is another letter also dated October 21, 2014, from Harwood Service Company, an affiliate of Nationstar, offering to provide the insurance coverage. The third page of that letter contains language, as part of a disclosure under the Fair Debt Collection Practices Act ("FDCPA"), stating that "if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, NATIONSTAR MORTGAGE LLC will only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally." Another notice dated December 11, 2014, informs the Debtor that Nationstar has advanced an annual premium of $1,988.00 for renewal of an insurance policy enclosed with the letter. The second page of that letter includes a paragraph in capital letters including the same language on the second page of the June 3, 2014 letter. The third page of the December 11, 2014, letter contains language at the bottom stating only that the notice is not an attempt to collect a debt "if your loan is currently in a bankruptcy status." A similar letter dated October 21, 2015, informs the Debtor that another $1,910.00 will be advanced for another annual insurance premium. Page three of that letter includes the same language under the FDCPA paragraph as the October 21, 2014 letter, and also includes a separate paragraph of "Important Bankruptcy Information" stating that "this letter is for informational purposes only and is not an attempt to collect a debt" if the

insurance fees but the payments on the loan and the insurance cease when the borrower is no longer on title. Loll testified that insurance is still required to protect the investor's interest in the value of the property as well as the borrower's if the property is worth more than the loan. He testified that the Debtor's loan agreement allowed the insurance costs to be charged against the loan and that Nationstar would be reimbursed the insurance costs advanced on a priority basis once the Slipstream Property is sold.

Loll testified that Nationstar was aware of the Contempt Motion that was filed in September 2015. He acknowledged that monthly billing statements continued to be sent by Nationstar after that date. Loll further acknowledged that after a hearing was scheduled for the Contempt Motion, Nationstar sent additional billing statements to the Debtor. He acknowledged that after the Debtor received her discharge, Nationstar still generated all of the Mortgage Loan Statements and Informational Statements.

Loll testified that, based on a Collection History Profile admitted as part of Debtor's Exhibit "7," [16] Nationstar commenced a skip trace in January 2015.[17] He ac-

knowledged that the Collection History Profile includes entries from December 17, 2013, through January 7, 2015, indicating that the Slipstream Property was vacant. Loll also testified that the Collection History Profile indicated that the Slipstream Property was vacant as of January 23, 2015. He was aware of an entry on January 24, 2015, that referred to a "Nevada Notice of Sale" but does not know if that entry means that Nationstar was aware that the Slipstream Property had been sold. Loll testified that he first became aware that the Slipstream Property had been sold only six months before the evidentiary hearing. Loll also testified that he had reason to believe that the Slipstream Property may have been occupied, but could not recall where he saw that information.[18] He testified that Nationstar was unaware of the exact occupancy status of the home because it did not know that Debtor was no longer on title to the Slipstream Property. Loll testified that as long as a property is in a borrower's name, Nationstar is required to provide loan servicing information. He testified that the Collection History Profile does not show when title to the Slipstream Property changed hands because a property inspec-

---

Debtor has received a bankruptcy discharge. Another notice dated December 14, 2015, contains language similar to the December 11, 2014 letter, regarding $1,910.00 advanced for annual insurance, a copy of which is enclosed with the later letter. Pages two and three of the December 14, 2015, letter are almost the same as the language of pages two and three of the December 11, 2015, letter.

16. It appears that the Collection History Profile was printed by Nationstar on May 20, 2015. There are no home or work telephone numbers for the borrower in the space at the top of the page. It is not clear whether the lack of a phone number reflects the situation that existed on the date the document was printed, or whether Nationstar had a phone number for the Debtor prior to that date.

17. Loll testified that a skip trace includes an attempt to obtain a phone number for the borrower. The purpose of contacting the Debtor was to make sure that all personal property has been removed and that she did not intend to return to the Slipstream Property.

18. The Collection History Profile apparently was generated from Nationstar's electronic records on May 20, 2015. The entry for 12/17/14 on page 000157 of the exhibit contains the words "Property Occupied," which the court assumes is the occupancy information that Loll could not recall on the witness stand.

tion would not do so.[19]

Loll testified that the property inspections referenced in the Collection History Profile would not indicate whether the Slipstream Property had been sold. He acknowledged that the monthly statements showed a billing address for the Debtor at 5353 S. Jones Boulevard, Apt. 1035, Las Vegas, Nevada 89118–0543, along with a property address of 7593 Slipstream Street, Las Vegas, Nevada 89139. Loll testified that whoever coded the information must have assumed that the Jones Boulevard address was for the Debtor's bankruptcy attorney rather than the personal address of the Debtor.[20] Apparently, that was the information provided when Na-

tionstar received the file from BOA. He acknowledged that the monthly billing and informational statements should not have been sent to the Debtor after she no longer was on title.[21] Loll maintained that Nationstar never knew that the Slipstream Property had been sold because it was never contacted by the purchaser (Wishing Well), nor was it contacted by the borrower (Debtor).[22] Moreover, he testified that once a debtor receives a Chapter 7 discharge, Nationstar will not check with PACER or otherwise review any pleadings or documents in connection with the bankruptcy proceedings.[23] Loll testified that he believed Nationstar became aware of the transfer of title some time in the past

19. Loll testified that until the Slipstream Property was physically entered in March or April 2015, and the locks were changed, Nationstar did not know whether the Debtor had any personal possessions remaining there.

20. As a result of Nationstar's belief that the Jones Boulevard address was that of Debtor's attorney, Loll also testified that Nationstar would not have checked the case docket to determine the status of the Debtor's bankruptcy case, nor to determine the actual address of Debtor's counsel. It is not clear, however, whether Nationstar's practice of not verifying the address of the debtor's counsel is limited to situations where the debtor already has received a discharge.

21. Loll initially testified on April 26, 2016, and resumed his testimony on May 3, 2016. During his later testimony, Loll attested that he had re-coded the loan file after the prior testimony to ensure that monthly statements go to Wishing Well rather than to the Debtor. Presumably those monthly statements are not simply informational as long as Wishing Well retains the Slipstream Property and remains on title.

22. Loll testified that the Debtor has filed a separate lawsuit against Nationstar. He stated that when that suit was filed, Nationstar coded the Debtor's account as being a matter in litigation. As a result, he testified that the matter would be referred to Nationstar's legal

department and all communications with the Debtor, including sending Mortgage Loan Statements and Informational Statements, should cease. Loll testified that in the Debtor's case, however, Nationstar did not stop sending communications to the Debtor because it apparently believed the Jones Boulevard address was for the Debtor's attorney rather than the Debtor. Loll was not asked whether Nationstar ever compared the attorney's address on the complaint initiating the lawsuit against the address in its loan records. Nationstar's Exhibit JJ is a copy of the Debtor's response to interrogatories. Debtor's response to Interrogatory No. 11 indicates that the Debtor's lawsuit against Nationstar was filed on May 13, 2015. According to Loll's testimony, that lawsuit should have been referred to Nationstar's legal department and no further communications should have been sent to the Debtor at all.

23. "PACER" is an acronym for Public Access to Court Electronic Records. PACER is a service available for members of the public to examine documents filed in court proceedings. As Loll was not previously asked whether he was familiar with PACER, the court assumes that Loll and Nationstar are well aware that Nationstar can access the bankruptcy records of the borrowers for the loans it services. Apparently as a matter of policy, Nationstar simply does not access the bankruptcy records of debtors who already have received a discharge.

three to six months, i.e., no sooner than November 2015, as a result of the Chapter 11 proceedings commenced by Wishing Well.[24]

Loll testified that Nationstar is obligated under the 2014 rules promulgated by the federal Consumer Financial Protection Bureau ("CFPB") to provide the borrower with standard information. He testified that until the property is transferred, the borrower on title still has rights under the applicable insurance policy.

Loll testified that Nationstar does not know the Debtor's level of education, nor does it know the Debtor's health status. He testified that even after a debtor receives a discharge, there may still be some loss mitigation if the borrower still wants to keep the property.[25] Loll testified that Nationstar employees in the loss mitigation department receive bonuses if a loan is modified, but they otherwise have no incentive to encourage borrowers to reaffirm or modify their loans. Loll testified

that he holds shares in Nationstar but has no idea of the value of Nationstar's assets.

Loll also testified that Nationstar was not represented in the Debtor's bankruptcy proceeding by the law firm of McCarthy & Holthus even though that law firm previously submitted a stipulation on January 21, 2014, representing that it was appearing as attorney for "U.S. Bank National Association . . ., by and through its servicing agent Nationstar Mortgage LLC." He testified that he does not know who McCarthy & Holthus was representing in the Debtor's bankruptcy case and that the law firm should have signed the Withdrawal Stipulation on behalf of Nationstar, rather than BOA, if it was actually representing Nationstar.[26]

Loll also questioned why the Chapter 7 bankruptcy trustee sold the Slipstream Property to Wishing Well subject to all liens for only $3,000, or why the bankruptcy court would even allow it. He testified that in his thirty years of experience in the consumer loan servicing industry, he had

---

**24.** Wishing Well filed its voluntary Chapter 11 petition on February 4, 2015, and Nationstar was included in the mailing matrix. (Wishing Well ECF No. 1). Notice of the first meeting of creditors was issued on February 4, 2015 (Wishing Well ECF No. 3), and was served on February 7, 2015, to all creditors including Nationstar. (Wishing Well ECF No. 6). On February 18, 2015, Wishing Well listed Nationstar as a creditor secured by seven parcels of real property on its Schedule "D," none of which were the Slipstream Property. (Wishing Well ECF No. 17). On February 25, 2015, a request for special notice on behalf of Nationstar was filed by the Tiffany & Bosco law firm. (Wishing Well ECF No. 20). On March 28, 2015, three separate Notices of Change of Address were filed on behalf of Nationstar in the Wishing Well proceeding. (Wishing Well ECF Nos. 36, 37, 38). On July 10, 2015, another request for special notice was filed in the Wishing Well proceeding by the Tiffany & Bosco law firm on behalf of Nationstar. (Wishing Well ECF No. 79). On August 11, 2015, an election under Section 1111(b) was filed by the Greenberg Traurig law firm on

behalf of Nationstar. (Wishing Well ECF No. 89). On September 15, 2015, a notice of change of address was filed by the law firm of Pite Duncan apparently on behalf of Nationstar. (Wishing Well ECF No. 116). On March 30, 2016, a stipulation for plan treatment was filed, and signed by the law firm of Wright, Finlay & Zak on behalf of Nationstar. (Wishing Well ECF No. 253). Based on this record, it appears that Nationstar was aware of the Wishing Well bankruptcy proceeding no later than February 25, 2015, rather than November 2015, and has employed no less than four different law firms in that bankruptcy proceeding.

**25.** He testified that CFPB rules require a loan servicer to provide a borrower with loss mitigation information.

**26.** Loll did not testify that McCarthy & Holthus committed fraud by putting Nationstar's name on the Withdrawal Stipulation, but he testified that the law firm actually signed it on behalf of BOA rather than Nationstar.

never experienced a property being sold in bankruptcy subject to existing liens.[27] Loll testified that because the sale did not result in a liquidation that paid off the existing loan against the Slipstream Property, a "perfect storm" was created where the loan acquired by the investor was not satisfied, but the servicing rights were transferred by an entity (BOA) that could have objected to the sale,[28] to another entity (Nationstar) that never knew about the sale. He testified it always has been Nationstar's policy and procedure not to check the pleadings from a Chapter 7 bankruptcy case if a discharge already has been granted.

### 2. Kim Michele Vanamann ("Debtor").

Debtor did not graduate from high school but obtained a GED. She is unmarried and has an adult daughter. Debtor was a bartender for 27 years and was last employed in 2013. She currently receives approximately $700 to $1100 per month selling items over the internet. Debtor testified that she finds the items on sale elsewhere, or she sells personal possessions. She started using eBay to sell such items in February 2016.[29] Debtor testified that she has applied for Social Security benefits.

Debtor testified that she purchased the Slipstream Property in 2004. She had purchased a previous home in North Las Vegas in 1995, but she sold that property to move to a better neighborhood with better schools for her daughter. The Slipstream Property was purchased with a loan from Countrywide that subsequently was taken over by BOA. Debtor testified that her labor union later threatened to strike, so she obtained another loan secured by a second mortgage in order to meet living expenses.

Debtor testified that she commenced her bankruptcy case in 2009, by filing a Chapter 13 petition. The purpose of filing for Chapter 13 was to keep the Slipstream Property. Debtor testified that she converted her case to Chapter 7 in 2012, however, because she could not keep up the plan payments due to her minimal working hours. Debtor testified that her hours had been reduced because of an automobile accident that occurred in 2008. The accident left her with significant injuries that result in pain to her hips, neck and back, as well as migraines. She testi-

---

27. Loll testified that he was the vice president of Nationstar's bankruptcy department from 2002 through 2004. He was not asked to detail his experience in dealing with "underwater" homes in bankruptcy, i.e., whether the loans far exceeded the value of the residences. During the nationwide recessionary period between 2008 and 2012, cases administered by Chapter 7 trustees in the hardest hit areas such as Las Vegas, included thousands of underwater homes for which the trustee could exercise their business judgment to abandon the properties, negotiate short sales with the lenders carving out funds for the bankruptcy estates, or, sell the properties subject to liens. Any of the alternatives were allowed under Section 554 or Section 363, subject to notice and an opportunity to be heard. As previously discussed at 3–4, BOA objected to the Sale Motion at the November 21, 2013 hearing, but never appealed the Sale Order that was entered on December 13, 2013.

28. Loll offered no testimony disputing that BOA was served with the Sale Motion, filed opposition to the Sale Motion, and approved the form of the Sale Order. He only testified that the McCarthy & Holthus law firm did not represent Nationstar in the proceeding despite the language appearing on the Withdrawal Stipulation and related notice of entry of the court order approving the Withdrawal Stipulation.

29. Debtor acknowledged that prior to selling items on eBay, the actions of Nationstar had no affect on her income, earnings, or any business.

fied that she moved out of the Slipstream Property in November 2012 [30] and has no desire to ever live there again. She testified that she took an absence from work under the Family Medical Leave Act, but eventually had to quit working as a bartender in 2013 due to her physical limitations.

Debtor testified that she continues to have significant health problems stemming from her automobile accident. She has seen her primary care physician for the past nine years and also has seen numerous specialists in neurology, podiatry, physical therapy, and pain management. Debtor testified that she takes, and has taken, a variety of prescribed medications for her ailments, including Percocet, Lyrica, Xanax, Valium, Naprosyn, Baclofen, Triazolam, and Imitrex. She testified that the quantity of Xanax and Valium pills she was prescribed each month was adjusted periodically between 2012 and 2014. Debtor testified that today her dosages for those medications are back to what they were in 2012. She testified that feelings of hopelessness led her to attempt suicide three times in 2013 and once in 2014.

Debtor testified that in early 2014, she started visiting her bankruptcy attorney regarding the communications she started receiving from Nationstar.[31] She did not know who or what Nationstar is because she had never signed any agreements with, and never dealt with Nationstar concerning the Slipstream Property that she had

vacated in late 2012. Debtor testified that in contrast, she knew about BOA, but knew nothing about Nationstar. She acknowledged that she did not contact Nationstar concerning the documents that Nationstar sent to her and does not know if her attorney ever contacted Nationstar. Debtor acknowledged that she may have deposited a check in the amount of $873.17 from Nationstar dated November 19, 2014, that she assumed was for an escrow overpayment by BOA.[32] She testified that the check was received some time before Nationstar sent its first Mortgage Loan Statement dated December 22, 2014.[33]

Debtor testified that her receipt of Mortgage Loan Statements, Informational Statements, Insurance Notices, and other documents from Nationstar has caused extreme anxiety and distress that is unrelated to her 2008 automobile accident. She testified that she has bad memories associated with the Slipstream Property, including the death of a significant other's child, and has never had any intention of occupying that house after she vacated the premises in 2012. Debtor testified that the continued receipt of statements from Nationstar on a house she does not occupy, on a loan that she no longer owes, and for amounts that she could never pay, causes her extreme anxiety and distress. She testified that she relies on the mail to produce income each month, but dreads going to the mailbox at certain times each month. Debtor testified that every time

---

**30.** In her declaration in support of the contempt motion against BOA, Debtor testified that she surrendered the Slipstream Property on December 11, 2012.

**31.** She testified that she spent a few hundred dollars on gas to visit her attorney and paid $260.00 to reopen her bankruptcy case.

**32.** Debtor testified that she believes her attorney was informed of the check from Nationstar, but did not explain to Nationstar's coun-

sel how she knew what the check was for. Debtor's demeanor during this stretch of testimony indicated perhaps greater experience with or knowledge of residential loan servicing.

**33.** A copy of the check was offered to refresh the Debtor's memory but not admitted into evidence. The face of the check identified it as an escrow disbursement and the back of the check was endorsed by the Debtor.

she received the uniquely identifiable envelopes from Nationstar, it leads her to a state of isolation and possibly renewed feelings of hopelessness. She testified that when she reads statements each month that she owes over $100,000, it has a crippling effect that increases her anxiety, leading to panic attacks and isolation. Debtor testified that after reading the amount requested on the statements, she simply puts them back in the envelope without reading the rest.[34]

Debtor testified that she believed the initial communications she received from Nationstar in early 2014, including a welcome letter dated December 12, 2013, looked like just another bill. She testified that a Notice of Placement of Insurance letter dated February 23, 2014, meant that she still owed money for insurance on the Slipstream Property. Debtor testified that she may have received a letter from Nationstar dated April 30, 2015, identifying a specific point of contact for her loan, but that she did not contact that person. She testified that she provided that letter to her attorney but does not know whether her attorney ever attempted to contact the person identified in the letter.

Debtor testified that even after the Contempt Motion was filed on September 26, 2015, Nationstar continued to send her statements. She testified that she was particularly upset when she went to her mailbox on Friday, April 29, 2016, and received another Informational Statement from Nationstar dated April 19, 2016, even though she had been to bankruptcy court on April 26, 2016, seeking relief from Nationstar's actions.[35]

## APPLICABLE LEGAL STANDARDS

Section 524(a)(1) provides in relevant part that a bankruptcy discharge "voids any judgment at any time obtained, to the extent such judgment is a determination of the personal liability of the debtor with respect to any debt discharged ..." Section 524(a)(2) provides in relevant part that the bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, ... or an act, to collect, recover or offset any such debt as a personal liability of the debtor ..."

■ A debtor who asserts that the Discharge Injunction has been violated must seek relief from the bankruptcy court by motion rather than through commencement of an adversary proceeding. See Barrientos v. Wells Fargo Bank, N.A., 633 F.3d 1186, 1190 (9th Cir. 2011).

The Bankruptcy Appellate Panels for the Ninth Circuit ("BAP") summarized the standards applicable to the enforcement of the discharge injunction as follows:

To be subject to sanctions for violating the discharge injunction, a party's violation must be "willful." The Ninth Circuit applies a two-part test to determine whether the willfulness standard has been met: (1) did the alleged offending party know that the discharge injunction applied; (2) and did such party intend the actions that violated the discharge injunction? *In re Nash*, 464 B.R. at 880 (citing *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1205 n.7 (9th Cir.2008), aff'd, [559] U.S.

---

**34.** Debtor testified that she treats other bills in the same fashion, e.g., a cable statement, where she reads the amount due and does not read the rest. She testified that the statements she receives from Nationstar look very similar to the prior mortgage statements she received.

**35.** By stipulation of counsel, that Informational Statement dated April 19, 2016, was added as part of Debtor's Exhibit 3, and admitted into evidence.

[260], 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010); *Zilog, Inc. v. Corning (In re Zilog, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006). For the second prong, the bankruptcy court's focus is not on the offending party's subjective beliefs or intent, but on whether the party's conduct in fact complied with the order at issue. *Bassett v. Am. Gen. Fin. (In re Bassett)*, 255 B.R. 747, 758 (9th Cir. BAP 2000), *rev'd on other grounds*, 285 F.3d 882 (9th Cir. 2002). "A party's negligence or absence of intent to violate the discharge order is not a defense against a motion for contempt." *Jarvar v. Title Cash of Mont., Inc. (In re Jarvar)*, 422 B.R. 242, 250 (Bankr. D. Mont. 2009)(citing *Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1009–10 (Bankr. D. Minn. 1994)); *see also In re Sanburg [Sandburg] Fin. Corp.*, 446 B.R. 793, 804 (S.D. Tex. 2011)(that the offending party may have not understood its actions to violate the discharge injunction does not negate the willfulness finding, even if true).

The moving party must prove by clear and convincing evidence that the offending party violated the order. *In re Zilog, Inc.*, 450 F.3d at 1007; *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003). The moving party also has this same burden to prove that sanctions are justified. *Espinosa*, 553 F.3d at 1205 n.7. The burden then shifts to the offending party to demonstrate why it was unable to comply. *In re Bennett*, 298 F.3d [1059] at 1069 [ (9th Cir.2002) ]. If a

bankruptcy court finds that a party has willfully violated the discharge injunction, it may award actual damages, punitive damages and attorney's fees to the debtor. *In re Nash*, 464 B.R. at 880 (citing *Espinosa*, 553 F.3d at 1205 n.7 (citing 2 Collier Bankruptcy Manual ¶ 524.02[2][c] (3d rev. ed.))). The bankruptcy court has broad discretion in fashioning a remedy for violation of the discharge injunction. *In re Bassett*, 255 B.R. at 758.

Rosales v. Wallace (In re Wallace), 2012 WL 2401871 at *5 (9th Cir. BAP June 26, 2012).[36]

■ A bankruptcy court's civil contempt authority under Section 105(a) is limited to relatively mild, non-compensatory fines rather than serious punitive sanctions. *See* Dyer, 322 F.3d at 1193.[37] An award of attorneys' fees also is an appropriate component of a civil contempt award. *See* Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 507 (9th Cir. 2002). Because actual damages can include emotional distress damages for an automatic stay violation, *see* Dawson, 390 F.3d at 1148, courts also have authority to award emotional distress damages for a discharge violation. *See* Green Point Credit, LLC v. McLean (In re McLean), 794 F.3d 1313, 1325 (11th Cir. 2015). Proof of pecuniary loss is not required for an award of emotional distress damages. *See* Dawson v. Washington Mutual Bank (In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2004).

**36.** The summary cites, and is consistent with, the view previously expressed by the BAP in Nash v. Clark Cnty. Dist. Attorney's Office (In re Nash), 464 B.R. 874, 880 (9th Cir. BAP 2012). Although Nash was decided in 2012, neither Nash nor Espinosa addressed whether a bankruptcy court has authority under Section 105(a) to award punitive damages for contempt. That issue was decided in the negative by the Ninth Circuit in Dyer and Dyer was not overruled by Espinosa.

**37.** The Dyer court specifically considered the circuit split on whether a bankruptcy court has authority under Section 105(a) to award punitive damages. 322 F.3d at 1193 n.15. The Dyer panel concluded that civil contempt sanctions provide remedies adequate to enforce the Bankruptcy Code, thereby rendering punitive sanctions unnecessary within the meaning of Section 105(a). Id. at 1193.

More recently, the BAP also observed as follows:

> Taken together, *Bennett, Dyer*, and *Zilog*, demonstrate that the Ninth Circuit has crafted a strict standard for the actual knowledge requirement in the context of contempt before a finding of willfulness can be made. This standard requires evidence showing the alleged contemnor was aware of the discharge injunction *and* aware that it applied to his or her claim. Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry which implicates a party's subjective belief, even an unreasonable one. Of course, subjective self-serving testimony may not be enough to rebut actual knowledge when the undisputed facts show otherwise. *See Chionis v. Starkus (In re Chionis)*, BAP No. CC–12–1501–KuBaPa, 2013 WL 6840485, at *6 (9th Cir. BAP Dec. 27, 2013) (reversing the bankruptcy court's finding that actual knowledge of the discharge injunction was not shown based on alleged contemnor's self-serving testimony when the undisputed facts showed otherwise).

> With respect to the second prong—the intent requirement for a finding of willfulness—the analysis concerning a "willful" violation of the discharge injunction is the same as a finding of willfulness in connection with violation of the automatic stay under § 362(k). In connection with the second prong's intent requirement, we have previously observed that "the bankruptcy court's focus is not on the offending party's subjective beliefs or intent, but on whether the party's conduct in fact complied with the order at issue." *Rosales v. Wallace (In re Wallace)*, BAP No. NV–11–1681–KiPaD, 2012 WL 2401871, at *5 (9th Cir. BAP June 26, 2012) (citing *Bassett v. Am. Gen. Fin. (In re Bassett)*, 255 B.R. 747, 758 (9th Cir. BAP 2000), *rev'd on other grounds*, 285 F.3d 882 (9th Cir. 2002) (stating that courts have applied an objective test in determining whether an injunction should be enforced via contempt power) (citing *In re Hardy*, 97 F.3d [1384] at 1390 [ (11th Cir.1996) ]); *see also In re Dyer*, 322 F.3d at 1191 (noting that a "willful violation" does not require a specific intent to violate the automatic stay).

> Accordingly, each prong of the Ninth Circuit's two-part test for a finding of contempt in the context of a discharge violation requires a different analysis, and distinct, clear, and convincing evidence supporting the analysis, before a finding of willfulness can be made.

*Emmert v. Taggart (In re Taggart)*, 548 B.R. 275, 288 (9th Cir. BAP 2016).[38]

## DISCUSSION

The Discharge Order was entered on May 1, 2013. From that point on, Debtor was protected by Section 524 and the Discharge Injunction barred any act to collect on the Promissory Note as a personal liability of the Debtor. By her Renewed Contempt Motion, Debtor maintains that Nationstar willfully violated the Discharge Injunction and that she suffered damages as a result. In addition to actual damages, Debtor seeks recovery of punitive dam-

---

**38.** The Taggart panel also noted that:

The clear and convincing evidence standard requires the moving party to "place in the ultimate factfinder an abiding conviction that the trust of its factual contentions are 'highly probable.' "... Factual contentions are highly probable if the evidence offered in support of them "instantly tilt[s] the evidentiary scales in the affirmative when weighed against the evidence [the non-moving party] offered in opposition."

548 B.R. at 288 n.11 (citations omitted).

ages and attorneys' fees.[39]

## A. Willful Violation.

As discussed above, the standard in this circuit for finding a willful violation of the Discharge Injunction requires an analysis of two prongs.

### 1. Did Nationstar have knowledge that the discharge injunction applied to the Debtor's obligation under the Promissory Note?

█ The evidence is clear and convincing that Nationstar knew that the discharge injunction applied to the Debtor's personal obligations under the Promissory Note. Nationstar's predecessors, BOA and USB, knew that the Debtor had filed for Chapter 13 relief and that her case was converted to Chapter 7. Loll testified that when the loan documents and information was received from BOA some time around December 12, 2013, Nationstar was informed that the Debtor already had received her discharge. He acknowledged that BOA had coded the loan file so that no telephone calls would be made to the Debtor, but stated that other information could be communicated. Loll was candid

---

39. In her post-trial brief, Debtor cites a variety of cases where, unsurprisingly, substantial awards of damages or attorneys' fees were granted in what she characterizes as "similar types of conduct in violating the discharge injunction and other consumer protection statutes." Debtor's Closing Brief at 26:12. However, none of the cases she cites, id. at 26:14 to 27:20, are persuasive in connection with a discharge violation in this circuit, and some of the Debtor's citations actually are misleading. In re Manaois, Case No. 11–51261 (Bankr. D. Nev. 2015), involved an order that included a combined award of $150,000 for emotional distress and punitive damages for a discharge violation on an uncontested basis when punitive damages clearly are not allowed in this circuit. Kaufman v. Monte (In re Kaufman), 315 B.R. 858 (Bankr. N.D. Cal. 2004), involved an award of $570,000 in punitive damages for an automatic stay violation that was specifically permitted by then–Section 362(h). In re Haemmerle, 529 B.R. 17 (Bankr. E.D. N.Y. 2015), involved an award of $69,500 in punitive damages for a discharge violation as permitted in the Second Circuit, but not in the Ninth Circuit. Nosek v. Ameriquest Mortgage Co. (In re Nosek), 2006 WL 1867096 (Bankr. W.D. Mass. 2006), involved an award of $250,000 in emotional distress damages for breach of the implied covenant of good faith and fair dealing under Massachusetts law where the plaintiff's testimony was corroborated by testimony from her therapist, primary care physician, and pastor. Goodin v. Bank of America, N.A., 114 F.Supp.3d 1197 (M.D. Fla. 2015), involved an award of emotional distress damages of $50,000 under the FDCPA and $100,000 in punitive damages under the Flor-ida equivalent of the FDCPA. Bennett v. Bay Area Credit, 226 Fed.Appx. 725 (9th Cir. 2007), actually involved the reversal of an excessive award of $649,000 in punitive damages under the FDCPA as a violation of substantive due process. Fausto v. Credigy, 598 F.Supp.2d 1049 (N.D. Cal. 2009), actually involved the denial of summary judgment on a complaint, not an award, seeking emotional distress and punitive damages under the FDCPA. [Disturbingly, Debtor represents in her post-trial brief that $500,000 was awarded]. Heib v. Arches Financial, 2008 WL 4601602 (E.D. Wash. Oct. 14, 2008), involved a default judgment awarding $75,000 in emotional distress damages to two plaintiffs under the Washington Consumer Protection Act and $1,000 in statutory damages to each plaintiff under the FDCPA. Komarova v. National Credit Acceptance, 175 Cal.App.4th 324, 95 Cal.Rptr.3d 880 (1st Dist. 2009), involved an attorneys' fee award of $356,000 under the California version of the FDCPA. Pope v. Man–Data, Inc., 209 F.3d 1161 (9th Cir. 2000), involved a $100,000 punitive damage award under the FDCPA and its equivalent under Oregon law. Sporn v. Home Depot, 126 Cal.App.4th 1294, 24 Cal.Rptr.3d 780 (4th Dist. 2005), involved an award of $930,000 of unspecified damages on a default basis, possibly under the Fair Credit Reporting Act and California tort law. Finally, Young v. Bank of America, 141 Cal.App.3d 108, 190 Cal.Rptr. 122 (1st Dist. 1983), involved an award of $50,000 in emotional distress damages that were trebled under the California Credit Card Act.

that once a discharge was received by the Debtor, she no longer owed any money on the Promissory Note.

While Nationstar disputes that it violated the Discharge Injunction, that dispute is immaterial as to whether it had knowledge of its applicability to obligation under the Promissory Note. Thus, the first prong of the Ninth Circuit standard for a finding of willfulness has been met.

## 2. Did Nationstar intend the actions that violated the discharge injunction?

As previously discussed, the Debtor's discharge did not eliminate Nationstar's lien against the Slipstream Property, but it did eliminate the Debtor's personal liability for the Promissory Note pursuant to Section 727(b). As a result, the Discharge Injunction prohibited any "act, to collect, recover or offset any such debt as a personal liability of the debtor ..." 11 U.S.C. § 524(a)(2).

After the Debtor received her discharge, Nationstar continued to send letters and notices to her regarding obligations under the Promissory Note. It sent Mortgage Loan Statements and Informational Statements, all of which stated that various payments were "due" while including disclaimer language that Nationstar knew was inapplicable to the Debtor.[40] Nationstar also attached payment coupons to the Mortgage Loan Statements and Informational Statements setting forth an amount due, and then changed the language to "VOLUNTARY PAYMENT COUPON" in February 2015. It even sent the Debtor a

letter declaring her to be in default of her obligations under the Promissory Note, as well as, a notice advising her that foreclosure proceedings would be initiated.

Loll testified that Nationstar's policy is not to check a borrower's bankruptcy information once a discharge is indicated in the file. He did not dispute that had Nationstar checked the Debtor's bankruptcy file, it would have discovered the Sale Order that was entered on December 13, 2013, i.e., at or near the time the servicing of the loan was transferred from BOA to Nationstar. Moreover, Loll testified that had Nationstar known that the Slipstream Property was sold to a third party, it would not have continued to communicate with the Debtor.

Although Loll testified as to the reasons Nationstar continued to send letters, notices, Mortgage Loan Statements, and Informational Statements to the Debtor, there is no dispute that Nationstar intended to send all of those items. He testified that after the Debtor moved out of the Slipstream Property, someone at BOA erroneously coded her new apartment address as being the office address of the Debtor's attorney. Loll also testified that after the Debtor commenced a separate lawsuit against Nationstar, her loan file was coded by Nationstar as being in litigation, which should have stopped Nationstar from sending any further communications directly to the Debtor rather than her attorney. He acknowledged that even after the additional coding, however, Nationstar continued to send Informational Statements directly to the Debtor, including the

**40.** As previously discussed in note 14, Loll testified that he reviewed Nationstar's records for 2013, 2014, 2015, and 2016, and concluded that the disclaimer language was included only in the Mortgage Loan Statements for borrowers in bankruptcy or who had received a discharge. Presumably, Informational Statements containing the disclaimer language also are sent only to borrowers in bankruptcy or who had received a discharge. Because Nationstar already knows that no amounts are legally collectible from the discharged borrowers it sends the disclaimer language, there should be no reference at all to any amounts being "due."

statement she received in the mail after the evidentiary hearing commenced on the Contempt Motion. Loll offered no explanation of why Nationstar continued to send the Debtor the Informational Statements even after its litigation policy expressly prohibited any communications to the Debtor. Even if there were coding errors attributable to BOA or additional coding errors attributable to Nationstar, the resulting communications regarding the Promissory Note after the Debtor received her discharge were intentionally transmitted. Loll's testimony that Nationstar did not have specific intent to violate the Discharge Injunction or to injure the Debtor is immaterial to a finding of a willful violation. Compare In re Campion, 294 B.R. 313 (9th Cir. BAP 2003)(creditor's computer programming error did not impact willfulness of automatic stay violation for purposes of sanctions under Section 362(h)).

■ Nationstar's assertion that its many post-discharge communications were not intended to violate the Discharge Injunction misses the point of the discharge. Under Section 524(a)(2), the discharge operates as an injunction against any act by a creditor to recover a debt as a personal liability of the debtor, not just an act that succeeds. Virtually all of Nationstar's communications to the Debtor after she received her discharge stated that there was an amount due under the Promissory Note. Loll testified that Nationstar's "if you are in bankruptcy or received a discharge" disclaimers were only sent to borrowers in bankruptcy. See discussion at note 14, supra. In February 2015, the Mortgage Loan Statements that included a payment coupon for the Debtor to send an amount due by a specific deadline, suddenly became Informational Statements with a coupon for the Debtor to "voluntarily" send an amount due again by a specific deadline. Thus, whether a creditor could

actually subject a debtor to personal liability for a discharged debt is immaterial to whether the threat of such liability violates the Discharge Injunction. In this case, even if Nationstar did not intend to violate the Discharge Injunction, it clearly intended all of the acts that violated the protection afforded by Section 524(a)(2). The fresh start intended by the discharge would be meaningless if a debtor is continually subjected to legally unenforceable requests for payment. Compare In re Nordlund, 494 B.R. 507, 523 (Bankr. E.D. Cal. 2011)("One of the benefits an individual receives from a discharge is peace of mind. The individual need no longer be concerned that a discharged debt will be enforced against him or her. When a creditor disregards the discharge and attempts to collect a debt, it is certainly within the realm of possibility that the debtor will be harmed emotionally. When such occurs, the harm may be remedied.").

Nationstar's misguided view of the purpose of the discharge is illustrated by its attempt to shift the blame for its error onto the Debtor and her bankruptcy counsel. During the evidentiary hearing, Nationstar made a point of emphasizing that it had no record of ever receiving a phone call or other communication from the Debtor or her bankruptcy attorney objecting to the various communications. It emphasized that the Debtor was provided one or more specific points of contact in its notices and letters, but to no avail. Nationstar even argues that the Debtor's injuries could have been avoided entirely if the Debtor or her attorney had simply called. See Nationstar Closing Brief at 3:2–8 & n.2. Nationstar's position ignores, of course, its acknowledgment that its own policy led to its failure to examine the Debtor's bankruptcy history to ascertain that she no longer occupied or owned the Slipstream Property. Moreover, it also ignores the failure of Nationstar to follow its

own litigation coding of the file that admittedly should have brought to a screeching halt all further communications to the Debtor.

Having considered the testimony of the Debtor, as well as the testimony of Loll, in addition to the documentary evidence presented, the court concludes that Nationstar violated the Discharge Injunction by seeking to collect the Promissory Note from the Debtor. The court finds that the continuous transmittal of Mortgage Loan Statements and Informational Statements to the Debtor, all of which stated that there were amounts due, and all of which included so-called disclaimers that Nationstar knew to be inapplicable to the Debtor, violated the Discharge Injunction.

Having concluded that Nationstar intended the actions that violated the Discharge Injunction, the second prong of the Ninth Circuit standard has been met. Therefore, the court also concludes that Nationstar's violation of the Discharge Injunction was willful.

### B. Actual Damages.

■ Debtor's monetary losses from Nationstar's violation of the Discharge Injunction were minimal. She acknowledged that she started selling items on eBay in February 2016, and that Nationstar's actions did not affect her income, earnings, or business before that. Debtor also provided no testimony or documentary evidence, however, that Nationstar's conduct caused a loss of income, earnings, or business after she started selling items on eBay.

Debtor testified, without contradiction, that she expended a "few hundred dollars" on gas to visit her attorney's office and $260.00 to reopen her bankruptcy case. Debtor stated that she continues to take Xanax and Valium, but also testified that she began taking those medications some time in 2008 as a result of an automobile accident. Debtor did not provide any evidence or testimony as to how much she pays for her prescription medication each month. On this record, the court concludes that the Debtor sustained monetary losses of $560.00 as a result of Nationstar's conduct.

Debtor's non-monetary injuries consist of any emotional distress caused by the violation of the Discharge Injunction. Debtor does not claim that Nationstar or its predecessor, BOA, engaged in any act during her Chapter 13 proceeding or before entry of her Chapter 7 discharge, that would have violated the automatic stay. In other words, she does not seek compensation for the anxieties and pressures that arise when going through the bankruptcy process. Compare America's Servicing Co. v. Schwartz–Tallard, 438 B.R. 313, 321–22 (D. Nev. 2010), citing In re Dawson, 390 F.3d at 1149–50 ("To recover damages for emotional distress under § 362(k), 'an individual must (1) suffer significant harm (2) clearly establishing the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process).' "). Rather, the Debtor seeks compensation for the emotional distress incurred after having completed her bankruptcy and earning the fresh start afforded to the "honest but unfortunate" debtor. Thus, for the Debtor, violation of the Discharge Injunction had distinct emotional costs that were not "inherent in the bankruptcy process" at all. Instead, she had completed the bankruptcy process and was entitled to the full protection of the Discharge Injunction.[41]

---

41. In this respect, an individual who suffers a      violation of the Discharge Injunction is very

But that protection was lost when Nationstar continued to send notices, letters, Mortgage Loan Statements, and Informational Statements for the Slipstream Property that she no longer occupied, no longer owned, and no longer wanted. That she would suffer significant emotional distress is not unexpected. Debtor testified that she attempted suicide in 2013, apparently. before she vacated the Slipstream Property, and in 2014, apparently after she vacated the Slipstream Property. She testified that she was under treatment for depression before and after BOA transferred servicing of the loan to Nationstar. Debtor testified that her anxiety level increased in 2014 after she received a variety of communications from Nationstar, including the RESPA welcome letter, the insurance placement notices, and the point of contact letter. She testified that even though she did not completely read each of the notices, letters, Mortgage Loan Statements, and Informational Statements from Nationstar, her receipt of each of them in the mail caused a debilitating level of anxiety and dread that in turn produced a sense of hopelessness and renewed suicidal thoughts. Debtor's testimony was not corroborated or contradicted by her treating physician, nor by her medical records, because they were never admitted into evidence. Similarly, her testimony was not contradicted by testimony from a family member or neighbor, nor by an expert witness.[42] Absent any contradictory testimony or evidence, however, the court finds that the Debtor's testimony was credible.

Nationstar argues that the Debtor had so many prior emotional issues that its conduct was not the cause of significant harm, see Nationstar Closing Brief at 12:22 to 13:12, and that the Debtor was responsible to mitigate her damages by requesting Nationstar to cease communications. Id. at 14:18 to 16:7. Neither argument is persuasive.

The court need not articulate or apply an "eggshell debtor" theory in this case. That the Debtor had emotional challenges prior to obtaining her discharge did not make her fair game for her creditors after she obtained her discharge. A bankruptcy discharge provides a peace of mind like no other: it voids judgments obtained at any time, by any entity, from any court, determining the debtor's personal liability for any discharged debt, and it forever bars any act, by any entity, to collect any discharged debts as a personal liability of the debtor. Debtor had completed her bankruptcy case and had earned her fresh start. Whether an individual is emotionally fragile or not, even benign communications by a creditor that cast doubt on the applicability of the discharge can be expected to cause significant emotional harm.

---

different from an individual injured by a violation of the automatic stay or a violation of a plan confirmation order. In the latter situations, the bankruptcy process typically has not been completed and the anxieties and pressures continue. For the individual whose goal is to obtain a discharge, the anxieties and pressures should be relieved after the discharge is entered.

**42.** The Contempt Motion is a contested matter for which the adversary proceeding discovery rules set forth in FRBP 7028 to 7037 are applicable. See FED.R.BANKR.P. 9014(c).

FRBP 7035 incorporates FRCP 35, which sets forth the procedure by which a litigant can request another party to submit to a physical or mental examination where the latter's physical or mental condition is in controversy. There is no indication whether Nationstar sought an examination of the Debtor's mental condition even though she alleged that Nationstar's conduct caused emotional strain and distress, anxiety, humiliation, and loss of sleep. Instead, Nationstar apparently limited its discovery regarding damages to written interrogatories.

Nationstar's additional argument that the Debtor failed to mitigate her damages is nothing more than a comparative fault defense. In this case, Debtor did mitigate her damages by seeking medical treatment for her anxiety and depression. Nationstar's real argument appears to be that the Debtor and her bankruptcy counsel are at fault for not calling Nationstar and objecting to further communications.[43] But even Loll acknowledged that Debtor's commencement of a lawsuit against Nationstar should have, but never did, put an end to the stream of unwelcomed communications. The testimony of Nationstar's own witness, therefore, indicates that the suggested "mitigation" would not have been effective in any event. Moreover, Nationstar cites no authority that placed the responsibility on the Debtor to police her discharge. In this circuit, acts in violation of the automatic stay are void, rather than voidable. See Schwartz v. United States (In re Schwartz), 954 F.2d 569 (9th Cir. 1992). "If violations of the automatic stay are merely voidable, debtors must spend a considerable amount of time and money policing and litigating creditor actions." 954 F.2d at 571. Under Section 362(a)(6), the automatic stay, like Section 524(a)(2), bars any act to collect a prebankruptcy debt. Just as "the automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws," see Schwartz, 954 F.2d at 571, the bankruptcy discharge is the fundamental relief provided to the honest but unfortunate debtor. The court finds no basis to conclude that the Debtor or her bankruptcy counsel were required to object to the notices, letters, Mortgage

Loan Statements, and Informational Statements sent by Nationstar. Thus, the court concludes that Nationstar's effort to marginalize the harm suffered by the Debtor and to shift responsibility for its intentional actions to others is unpersuasive.

In this circuit, a bankruptcy court may award, in addition to actual damages, mildly punitive fines for a violation of the Discharge Injunction. See discussion at 121–23, supra. Beyond that, a contempt sanction becomes criminal in nature, and a bankruptcy court has no authority to impose such a measure.

Based on the evidence presented, the court finds that the Debtor suffered monetary losses of $260.00 for the filing fee in reopening the bankruptcy case. The court also will award the Debtor $300.00 for the gas expenses incurred in visiting her attorney. No amount will be awarded for lost income or business because no evidence of such losses was provided. Similarly, no medical expenses will be awarded inasmuch as the Debtor has provided no evidence of such expenses.

Based on the evidence presented, the court finds that the Debtor suffered significant emotional distress caused by Nationstar's violation of the Discharge Injunction. The court has found that letters, notices, Mortgage Loan Statements, and Informational Statements were sent by Nationstar in violation of the Discharge Injunction. Applying a fixed dollar amount to each letter, each notice, each Mortgage Loan Statement, or each Informational Statement,[44] however, would be arbitrary

43. Nationstar also appears to argue that Wishing Well was at fault for not informing Nationstar that it had purchased the Slipstream Property from the Debtor's bankruptcy estate. It also appears to fault the bankruptcy trustee for selling the Slipstream Property subject to existing liens and the court for approving the sale.

44. Debtor has not requested an award of actual damages on a daily basis, e.g., a fixed amount for each day between May 1, 2013, when Debtor received her discharge, and May 3, 2016, when Loll testified that he re-coded Nationstar's loan files to terminate any further Informational Statements to the Debtor. Compare Lucero v. Cenlar FSB, 2016 WL

because it assumes that the Debtor read each document and responded the same way each time. Absent an appropriate formula, the court concludes that the amount of $60,000 appropriately compensates the Debtor for the emotional distress caused by Nationstar's willful violation of the Discharge Injunction. This amount is based on the cumulative effect of the actions attributable to Nationstar, including the impact on the Debtor's emotional state, the continued communications sent after the Renewed Contempt Motion was filed, the destruction of the peace of mind intended by the discharge, and the credibility of the Debtor's testimony presented at the evidentiary hearing.

Based on the foregoing, the court concludes that the Debtor suffered actual damages in the total amount of $60,560.00 as a result of Nationstar's violation of the Discharge Injunction.

## C. Punitive Damages.[45]

█ As previously discussed, this court has no authority to award punitive damages for a violation of the Discharge Injunction, but it does have authority to impose mildly, non-compensatory fines in appropriate circumstances. In other circumstances, this court has imposed non-compensatory fines not exceeding two percent of the total amount sought by a lender that violated the Discharge Injunction by commencing a post-discharge lawsuit for the full balance of the discharged obligation. See, e.g., In re Grihalva, 2013 WL 5311227, at *6 (Bankr. D. Nev. Sept. 3, 2013)(imposing $10,000 fine when lender filed post-discharge state court complaint seeking personal judgment in the amount of $584,857.06). In the instant case, the latest Informational Statement sent by Nationstar, even after the hearing on the Contempt Motion was scheduled, see note 35, supra, states that $102,081.55 was owed by the Debtor and that the payment was due on May 1, 2016.

A fine is appropriate in this case because even after Nationstar became aware that the Debtor no longer occupied the Slipstream Property and no longer owned the Slipstream Property, it continued to send Informational Statements to the

---

337221, at *4 (W.D. Wash. Jan. 28, 2016)(awarding daily fines for a continuing violation of RESPA).

**45.** In addition to punitive damages, the prayer of the Renewed Contempt Motion sought to impose a "sanction," separate from compensatory damages and punitive damages. The requested sanction was an additional amount of $1,500 awarded against Nationstar for each written communication received by the Debtor prior to filing the original motion, plus an additional amount of $3,000 for each written communication received after the filing of the original motion. The requested "sanction" clearly has no compensatory purpose and even more clearly is designed to punish Nationstar for its conduct both before and after the Renewed Contempt Motion was filed. Debtor's requested sanction is just another name for a punitive damage award that this court has no authority to grant under Section 105(a). Moreover, applying a $1,500 or $3,000 per violation figure retrospectively serves none of the purposes that are at the core of a civil contempt sanction. Unlike criminal contempt that is designed to punish, civil contempt is designed to compensate the victim of the contemnor's misconduct and, if necessary, to coerce future compliance. See Dyer, 322 F.3d at 1192. Adopting a set dollar amount per violation can be arbitrary as it does not take into account the circumstances of the individual victim, and therefore, would not compensate for the actual damages suffered. By contrast, a prospective application of a set dollar amount per violation would have the coercive effect of encouraging compliance with the court's order while also providing the notice required to comport with due process. Imposing a $1,500 or $3,000 per violation sanction on Nationstar for its past conduct might be convenient, but it would serve none of the purposes of a civil contempt remedy, and therefore would be arbitrary.

Debtor long after knowing that she had discharged her personal liability on the Promissory Note. Nationstar's decision not to check the Debtor's bankruptcy information apparently was the result of its own policy of never checking a bankruptcy file when a prior loan servicer reports a discharge. It offers the prospect of erroneous bankruptcy information, however, as a justification for putting the disclaimer language in its Mortgage Loan Statements and Informational Statements to borrowers it already knows to be in bankruptcy. It thus appears that Nationstar has decided to mitigate the risk to itself, of some erroneous bankruptcy information in its loan files, by inserting disclaimer language that it knows is not applicable to the only borrowers who receive the disclaimers.[46] Yet Nationstar has not decided to mitigate the risk to borrowers, of erroneous bankruptcy information in its loan files, that may affect the borrowers' fresh starts in bankruptcy.

Nationstar's business decision resulted in actual damage to the Debtor and warrants, at a minimum, a mildly, non-compensatory fine of $5,000.00 that must be paid to the Debtor.

### D. Attorneys' Fees.

The court having determined that the Discharge Injunction was violated, will allow the Debtor to recover attorneys' fees and costs incurred in connection with the Contempt Motion from September 26, 2015, when the motion was filed, through June 17, 2016, when the post-hearing briefs were submitted. Debtor's counsel will be required to submit an itemized billing statement by an appropriate date, and Nationstar will be allowed an appropriate amount of time to submit objections to the billing statement. Thereafter, the court will enter a supplemental order with regard to attorneys' fees and costs.

The attorneys' fees and costs shall be awarded under Section 105(a) for Nationstar's violation of the Discharge Injunction.[47]

---

**46.** Loll testified that he does not know whether the McCarthy & Holthus law firm represented Nationstar in the Debtor's bankruptcy proceeding, notwithstanding the representations made on the documents the law firm filed in the bankruptcy case. Certainly the Withdrawal Stipulation was ambiguous because the document initially reflected that it was being submitted by the law firm as counsel for Nationstar while it also reflected that it was being signed on behalf of BOA. All prior documents submitted by the McCarthy & Holthus law firm in the case were on behalf of BOA or USB. Even if McCarthy & Holthus might previously have represented Nationstar in another bankruptcy case, the court cannot automatically impute the knowledge of a law firm to another party that does not have notice or actual knowledge of a different bankruptcy proceeding. See Perle v. Fiero (In re Perle), 725 F.3d 1023, 1027-28 (9th Cir. 2013).

**47.** As the rate of new bankruptcy case filings has declined significantly in this district, the court recently has experienced a significant increase in the number of debtors seeking sanctions for violation of the discharge injunction. It is unclear whether or not the increase is due to creditors devoting fewer resources to complying with the bankruptcy laws because of the reduced number of bankruptcies being filed. For the debtors who are seeking sanctions, they are often represented by the same bankruptcy attorneys who submit legal memoranda that appear to be copied from written arguments they filed in other cases. The same counsel also file similar declarations from their clients, many attesting under penalty of perjury to extreme mental and emotional anguish, manifesting in loss of sleep, lack of concentration, distraction at work, and the dual sockdolagers of "feeling hopeless" and "feeling betrayed by the legal system." Personal feelings, of course, are never rebuttable and therefore are never "arguable." Additionally, like pain and suffering, mental and emotional distress are difficult to assess, but may be subject to corroboration through other witnesses, e.g., treating physicians, family members, co-workers, and the

## CONCLUSION

For the reasons discussed in this Memorandum Decision, the Renewed Contempt Motion will be granted in part and denied in part. A separate order has been entered contemporaneously herewith.

like. Ordinarily, these types of damages are the bread and butter of "PI" (personal injury) practices where general damages are determined without specific proof of quantifiable loss, most commonly by a jury. An award of these types of damages is even less precise in bankruptcy proceedings where a specific quantification of claims ordinarily is paramount, juries seldom if ever are used, and bankruptcy judges generally have little or no history on which to guide their award of such damages. Compare Aiello v. Providian Fin. Corp. (In re Aiello), 239 F.3d 876, 879–80 (7th Cir. 2001)("The Bankruptcy Code was not drafted with reference to the emotional incidents of bankruptcy, however, and bankruptcy judges are not selected with reference to their likely ability to evaluate claims of emotional injury."). In a very real sense, a fledgling "DI" (discharge injunction) practice has emerged where experienced bankruptcy counsel are adjusting to recent declines in new bankruptcy cases by seeking to enforce the discharges obtained in their old bankruptcy cases. Along with it, the same damage calculation conundrum that leads to disparate and unsatisfactory results in PI cases will become more common in DI cases. As the stakes increase, no doubt the time and expense will increase.